# THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| Pack Liquidating, LLC, *et al.*[1] | : | Case No. 22–10797 (CTG) |
| | : | |
| Debtors. | : | (Jointly Administered) |

-----------------------------------------------------:

| | | |
|---|---|---|
| Official Committee of Unsecured Creditors of | : | |
| Pack Liquidating, LLC, *et al.*, derivatively, on | : | |
| behalf of the Debtors' estates, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Adv. Pro. No. 23–50590 (CTG) |
| v. | : | |
| | : | |
| Andrew Vagenas; 62 Castle Ridge LLC; | : | |
| Bradley Tramunti; Milend LLC; Gioia Ventures | : | |
| LLC; James Mastronardi; PPJDM LLC; | : | |
| JFMW Capital LLC; Jonathan Webb; Adam | : | |
| Berkowitz; 710 Holdings LLC; Glenn Nussdorf; | : | |
| Quality King Distributors, Inc.; Quality King | : | |
| Fragrances, Inc. d/b/a Quality Fragrance; Olla | : | |
| Beauty Supply, LLC d/b/a Ultra/Standard | : | |
| Distributors; Pro's Choice Beauty Care, Inc.; | : | |
| Deborah International Beauty Ltd.; RB Health | : | |
| (US) LLC; Reckitt Benckiser LLC d/b/a RB | : | |
| HyHo; Mead Johnson & Company LLC; | : | |
| McKesson Ventures LLC; McKesson | : | |
| Corporation d/b/a McKesson Medical; | : | |
| McKesson Medical-Surgical Minnesota Supply | : | |
| Inc.; Sealed Air Corporation (US); Shanklin | : | |
| Corp.; Automated Packaging Systems; The | : | |
| Emerson Group; Emerson Healthcare, LLC; | : | |
| Scott Emerson; Nitish Kapoor; Thomas Rodgers; | : | |
| Arjun Purkayastha; Carrie Williams; | : | |
| and Alter Domus (US) LLC, | : | |
| | : | |
| Defendants. | : | |

-----------------------------------------------------x

## FIRST AMENDED COMPLAINT

---

[1] The Debtors in these chapter 11 cases are: Pack Liquidating, LLC; GV Liquidating LLC; PM Liquidating, LLC; PP Liquidating, LLC; PV Liquidating, LLC; and AB Liquidating, LLC.

The Official Committee of Unsecured Creditors (the "<u>Committee</u>" or "<u>Plaintiff</u>") of Pack Liquidating, LLC, *et al.,* derivatively, on behalf of the estates of the debtors and debtors-in-possession in the above-captioned bankruptcy proceedings (collectively, the "<u>Debtors</u>"), by and through its undersigned counsel, as and for its first amended complaint ("<u>Complaint</u>") against the above-named defendants hereby alleges as follows:

## I.    NATURE OF THE ACTION

1.    On August 28, 2022, the Debtors commenced bankruptcy to pursue a wholesale liquidation of their business. The results of this process were underwhelming. The Debtors were only able to pay a fraction of their $53 million first lien secured debt, leaving nothing for unsecured creditors owed hundreds of millions of dollars.

2.    This result is a far cry from a purported $1.5 billion enterprise value less than a year prior to bankruptcy, when the Debtors entered into a merger agreement to take the company public through a SPAC merger. Had that transaction been consummated, the Debtors' insiders who are Defendants in this Complaint stood to receive their respective shares of over $1.3 billion in equity value. However, only 6 months later, in March 2022, the merger agreement was terminated, and the Debtors proceeded down a value destructive path that led to bankruptcy less than 6 months later. The Debtors' collapse was not the product of a changing SPAC market, but instead a persistent and pervasive, years-long pattern of company mismanagement and self-dealing by various insiders that put their own interests ahead of the interests of the Debtors and third-party unsecured creditors.

3.    The Debtors' business began in the late 2000s, when original founders, Andrew Vagenas, Bradley Tramunti, and James Mastronardi (collectively, the "<u>Original Founders</u>"), sought to expand their single location pharmacy into online sales. The Original Founders saw an opportunity to sell products through Amazon and similar platforms at lower costs

from their pharmacy suppliers.

4.       This model, which required minimal capital outlay, shifted in 2014, when the Original Founders teamed up with Jonathan Webb, Adam Berkowitz (Webb and Berkowitz, with the Original Founders, are referred to herein as the "Founders") and infamous retail diverter Quality King to undercut competition and sell cheaply sourced goods from Quality King. Over the next several years, the company's sales increased modestly, though the company was never profitable. In 2016, the company again shifted its business model and began partnering directly with more traditional suppliers such as Reckitt, McKesson, Sealed Air, and Emerson to further expand the business. In June 2018, Reckitt, McKesson, Sealed Air, and Emerson each became equity holders of the Debtors.

5.       While sales continued to increase over the ensuing years, the Debtors' losses mounted. The Founders and the insider vendors Quality King, Reckitt, McKesson, Sealed Air, and Emerson, were driven by dreams of taking the Debtors public and sought to drive top-line sales numbers at all costs rather than developing a sustainable, profitable business. Mismanagement and uncontrolled spending stymied gains, with losses outpacing gains each year. Along the way, the insider vendors profited from the Debtors' unchecked spending through new product purchases.

6.       By 2020, the Founders and Quality King were ready to cash in on their minimal initial investments and take advantage of a booming SPAC market. The Debtors, however, had insufficient capital to fund operations, drive sales growth to justify a public offering, and make critical infrastructure investments to allow the company to operate profitably.

7.       The Debtors needed a new investor, which they found in Carlyle. Carlyle intended to take the company public in the short to medium term and, in late 2020, invested

$260 million in the company. But rather than utilize this investment to fund an inadequate infrastructure, the Founders and Quality King immediately ███████████████████████

████████████████████████████████████████████████████████████

████████ The Founders and Quality King held considerable sway on the board of directors but were undeterred by the obvious conflict of interest when approving the transaction.

8. ██████████████████████████████ stripped the Debtors of much needed liquidity and left the Debtors with unreasonably small capital for an aggressive expansion plan designed to drive sales to justify a public offering. The Debtors continued to accumulate inventory they could not sell, entered into expensive leases for new warehouses that required significant improvements, and substantially expanded their employee count, all of which drained liquidity.

9. In September 2021, the Debtors entered into the SPAC merger agreement but, only one month later, the Debtors' ████████████████████████████████ ████████████████████. Over the ensuing months, it became abundantly clear that the IPO would fail. The Debtors exhausted the Carlyle investment and another $110 million of convertible notes proceeds. The Debtors were unable to keep up with payables to their suppliers and could not source necessary new inventory to maintain sales.

10. In March 2022, the merger agreement was terminated. Following termination, the Debtors were in crisis mode. Vendors and suppliers, including the self-interested vendor board members, refused to ship products due to chronic late or non-payment. Efforts to raise third-party debt or obtain new equity investments failed. Rather than accept reality, however, the insiders provided minimal new funding in April 2022 in the form of subordinated secured financing that they knew was insufficient to salvage the company. In exchange, (i) the vendor

board members ███████████████████████████████ (ii) Sealed Air and Emerson converted preexisting unsecured trade debt to secured debt, and (iii) Quality King and McKesson demanded immediate payment on existing trade debt. Within two months, the Debtors had exhausted this new funding and the insider vendors refused to ship new product or provide any additional funding, resulting in the filing of these cases.

11.     In the year leading up to the Petition Date, Quality King, Reckitt, McKesson, Sealed Air, and Emerson Healthcare and their affiliates and subsidiaries received over $70 million in preference payments. All of these entities were insiders and wielded significant influence over the company's decisions. These entities intentionally pushed the Debtors to prioritize the preference payments over non-insider creditors without regard for the company's well-being or the rights of other creditors. These payments were made when the Debtors were insolvent, and the recipients were acutely aware of the liquidity crunch in their position as board members. These parties should not be allowed to profit from their bad deeds at the expense of other creditors.

12.     As a result, the Committee brings this action to, among other things, (i) avoid at least ███████████ in preferential and fraudulent payments made to certain Defendants in the two years before the bankruptcy, (ii) avoid the ██████████████████████████ as a fraudulent conveyance, (iii) recharacterize the remaining Term Loan debt as equity, (iv) equitably subordinate and/or disallow the Term Loan Agent's and certain Term Lenders' claims, (v) hold certain Defendants liable for: (a) breaching the fiduciary duties of care and loyalty, (b) breaching the Debtors' operating agreements, (c) breaching the covenant of good faith and fair dealing, (d) unjust enrichment, and (e) aiding and abetting the foregoing; (vi) unwind or rescind inappropriate transactions and contractual obligations; and (vii) confirm by declaration that the prepetition liens

do not attach to leasehold interests and certain equity interests.[2]

13.    During the course of this adversary proceeding, the Committee may learn (through discovery or otherwise) of additional transfers made by the Debtors to the Defendants or others that are similarly subject to avoidance.  It is the Committee's intention to avoid and recover all transfers discussed herein made by the Debtors of an interest in the Debtors' property and to or for the benefit of the Defendants or any other transferee.  The Committee reserves the right to amend this Complaint to include: (a) further information regarding the transfers described herein (b) additional transfers, (c) modifications of and/or revisions to Defendants' names, (d) additional defendants, and/or (e) additional causes of action (*e.g.*, but not exclusively, causes of action under 11 U.S.C. §§ 506(d), 542, 543, 544, 545, 549, 550, and/or 553) (collectively, the "Amendments"), that may become known to the Committee at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

## II.    JURISDICTION AND VENUE

14.    This adversary proceeding (the "Adversary Proceeding") is brought in accordance with Rule 7001 of the Federal Rules of Bankruptcy Procedure.

15.    This Adversary Proceeding relates to the chapter 11 cases jointly administered as Pack Liquidating, LLC, *et al.*, Case No. 22–10797 (CTG) (the "Chapter 11 Cases").

16.    This Court has subject matter jurisdiction over this Adversary Proceeding

---

[2]    Pursuant to the Settlement Agreement (defined herein), the Committee has settled and resolved any claims against Carlyle and agreed to the allowance of the Allowed Carlyle Claim (defined herein).  The Committee has also compromised proofs of claims filed by 5E Consulting LLC, Daniel Myers, and Alter Domus (US) LLC; however, these compromises have not released the claims in this Complaint against Alter Domus (US) LLC.  *See* Docket No. 1096.

pursuant to 28 U.S.C. §§ 157 and 1334.

17.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409 because this is a proceeding relating to and arising under the Bankruptcy Code and the Debtors' Chapter 11 Cases.

18.     This Court may grant the requested declaratory relief pursuant to 28 U.S.C. § 2201(a), and such relief is properly sought by adversary proceeding pursuant to Federal Rules of Bankruptcy Procedure 7001(1), (2) and (9). The statutory bases for the additional relief requested are sections 502, 506, 510, 544, 547, 548, and 550 of the Bankruptcy Code.

19.     This is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Committee confirms its consent, pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure, to the entry of a final order by this Court if it is determined that the Court, absent the parties' consent, cannot enter final orders or judgments herein consistent with Article III of the United States Constitution.

### III.     PROCEDURAL BACKGROUND

20.     On August 28, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court. Following the Petition Date, the Debtors remained in possession of their assets and continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code to implement the wind down of the Debtors' operations. As of the filing of this Complaint, the wind down process has been substantially completed.

21.     Packable Holdings, LLC f/k/a Entourage Commerce LLC and now known as Pack Liquidating, LLC ("Entourage" or "Holdings") is the parent holding company for each of the other Debtors. Pharmapacks, LLC ("Pharmapacks") (now known as PP Liquidating, LLC) was the Debtors' primary operating entity.

22.     On September 13, 2022, the Office of the United States Trustee for the District of Delaware duly appointed the Committee in the Chapter 11 Cases pursuant to Bankruptcy Code section 1102.

23.     Pursuant to Bankruptcy Code section 1103, the Committee has investigated, and continues to investigate, the acts, conduct, assets, liabilities, and financial condition of the Debtors.

24.     On May 9, 2023, the Court entered the *Final Order (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying Automatic Stay; and (III) Granting Related Relief* (the "Final Cash Collateral Order").[3] Pursuant to paragraph 18 of the Final Cash Collateral Order, the Committee was granted automatic standing to commence a Challenge as defined in the Final Cash Collateral Order by July 31, 2023. The Challenge Deadline was subsequently extended by stipulations dated July 31, 2023, August 7, 2023, August 9, 2023, and August 18, 2023.[4] The Challenge Deadline is currently October 9, 2023, which date may be further extended with the written consent of the Term Loan Agent prior to the current Challenge Deadline.

25.     On May 19, 2023, the Court entered the *Order Approving Stipulation and Order Granting Derivative Standing to the Official Committee of Unsecured Creditors to Commence Preference and Related Chapter 5 Litigation Claims on Behalf of the Debtors' Estates,*[5] which order granted derivative standing to the Committee to investigate, assert, and settle preference claims and related Chapter 5 causes of action (collectively, "Chapter 5 Avoidance Actions") on behalf of the Debtors' estates.

---

[3]     Docket No. 753.

[4]     *See* Docket Nos. 872, 877, 881, and 892.

[5]     Docket No. 769.

26.     On September 28, 2023, the Committee filed the *Motion of the Official Committee of Unsecured Creditors for an Order Confirming the Committee's Leave, Standing and Authority to Commence, Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates* (the "Standing Motion")[6] seeking leave, standing and authority to commence, prosecute and settle breach of fiduciary duty and similar claims (the "BOFD Claims") on behalf of the Debtors' estates against the above-captioned defendants (collectively, the "Fiduciaries").  The Committee submits that it has authority under the Final Cash Collateral Order to pursue the BOFD Claims, but the Debtors raised issues regarding the Committee's standing to pursue such claim.  The Debtors, whose board currently consists of certain of the Fiduciaries, has refused to consent to Committee standing. The Committee filed the Standing Motion out of an abundance of caution to resolve any issues the Debtors may raise regarding the Committee's standing.

27.     On October 12, 2023, the Founders and certain related entities filed their joint objection to the Standing Motion.[7]

28.     The Founders and certain related entities filed their supplemental memorandum objecting to the Standing Motion on October 26, 2023.[8]

29.     On November 3, 2023, the Committee filed their supplemental brief in support of the Standing Motion.[9]

30.     On February 2, 2024, the Court entered the Memorandum Opinion granting the Committee standing to pursue breach of fiduciary duty claims with only limited exceptions.

---

[6] Docket No. 1026.

[7] Docket No. 1050.

[8] Docket Nos. 1099, 1100

[9] Docket No. 1117.

## IV. PARTIES

31. **The Committee.** The Committee, as Plaintiff in this Adversary Proceeding, represents the interests of the Debtors' estates and their unsecured creditors. The Committee is comprised of three members: (i) MTVL, LLC; (ii) Luxor Capital; and (iii) the Poses Family Foundation.

32. **Andrew Vagenas and 62 Castle Ridge LLC.** Upon information and belief: Defendant Andrew Vagenas is an individual resident of the state of New York. Mr. Vagenas was an original founder of Holdings in 2014 and holds membership interests[10] in Holdings through 62 Castle Ridge LLC ("Castle Ridge"), a limited liability company organized under the laws of the state of New York which is controlled by Mr. Vagenas. In addition to his equity interest in Holdings, Mr. Vagenas is a Term Lender (as defined herein) through Castle Ridge. Mr. Vagenas was the Chief Executive Officer of the Debtors until April 2022 and has been a member of the board of managers[11] of Holdings (the "Board") since 2014.

33. **Bradley Tramunti, Milend LLC and Gioia Ventures LLC.** Upon information and belief: Defendant Bradley Tramunti is an individual resident of the state of New York. Mr. Tramunti was an original founder of Holdings in 2014 and holds membership interests in Holdings through Milend LLC ("Milend"), a limited liability company organized under the laws of the state of New York which is controlled by Mr. Tramunti. In addition to his equity interest in Holdings, Mr. Tramunti is a Term Lender through Gioia Ventures LLC ("Gioia"), a limited liability company organized under the laws of the state of New York which is controlled by Mr. Tramunti. Mr. Tramunti was an officer of the Debtors and has been a member of the Board since

---

[10] The holders of membership interest in Holdings are also known as "Members."

[11] The members of the Board of Managers are also known as "Managers."

2014.

34.  **James Mastronardi, PPJDM LLC and JFMW Capital LLC**.  Upon information and belief: Defendant James Mastronardi is an individual resident of the state of New York.  Mr. Mastronardi was an original founder of Holdings in 2014 and holds membership interests in Holdings through PPJDM LLC ("PPJDM"), a limited liability company organized under the laws of the state of New York, which is controlled by Mr. Mastronardi.  In addition to his equity interest in Holdings, Mr. Mastronardi is a Term Lender through JFMW Capital LLC ("JFMW"), a limited liability company organized under the laws of the state of New York which is controlled by Mr. Mastronardi.  Mr. Mastronardi was the Chief Financial Officer of the Debtors until 2022 and was a member of the Board at all relevant times.

35.  **Jonathan Webb**.  Upon information and belief: Defendant Jonathan Webb is an individual resident of the state of New York.  Mr. Webb became an equity owner of Holdings in or about October 2014 and directly holds membership interests in Holdings.  In addition to his membership interest in Holdings, Mr. Webb is a Term Lender.  At all relevant times, Mr. Webb was VP of Special Projects at the Debtors and was a member of the Board.  Mr. Webb has been married to the niece of Glenn Nussdorf, Chief Executive Officer of the Quality King Entities (as defined herein), for approximately 20 years.

36.  **Adam Berkowitz and 710 Holdings LLC**.  Upon information and belief: Defendant Adam Berkowitz is an individual resident of the state of New York.  Mr. Berkowitz became an equity owner of Holdings in or about October 2014 and directly holds membership interests in Holdings.  In addition to his membership interest in Holdings, Mr. Berkowitz is a Term Lender through 710 Holdings LLC ("710 Holdings"), a limited liability company organized under the laws of the state of New York which is controlled by Mr. Berkowitz.  Mr. Berkowitz was

previously the Chief Operating Officer of the Debtors and was a member of the Board from 2014 through March 2022.

37. **Quality King Entities and Glenn Nussdorf.** Upon information and belief: Defendant Glenn Nussdorf is an individual resident of the state of New York; Quality King Distributors, Inc. ("Quality King") is a corporation organized under the laws of New York; Quality King Fragrance, Inc., d/b/a Quality Fragrance ("Quality Fragrance") is a corporation organized under the laws of Delaware; Olla Beauty Supply, LLC d/b/a Ultra/Standard Distributors ("Ultra") is a limited liability company organized under the laws of New Jersey; Pro's Choice Beauty Care, Inc. ("Pro's Choice") is a corporation organized under the laws of New Jersey; and Deborah International Beauty Ltd. ("Deborah International" and, collectively with Quality King, Quality Fragrance, and Ultra, the "Quality King Entities"), is a corporation organized under the laws of New York. Quality King is a wholesale distributor of health, beauty, and personal care products. The Quality King Entities share a principal business address and are based in Bellport, New York. Mr. Nussdorf or a member of his family serves as CEO of each of the Quality King Entities.

38. Mr. Nussdorf has a familial relationship with Jonathan Webb. Mr. Webb has been married to Mr. Nussdorf's niece for approximately 20 years. Mr. Nussdorf has been a member of the Board since 2014.

39. Quality King became an equity owner of Holdings in or about October 2014 ███████████████████████████████████████ In addition to its membership interests, Quality King also holds Series B-1 Preferred Units of Holdings.

40. Prior to the Petition Date, the Quality King Entities were some of the Debtors' largest suppliers. Quality King is also a Term Lender and leased the Debtors a distribution facility in Ronkonkoma, NY.

41.     **Reckitt Entities**.  Upon information and belief: Defendant RB Health (US) LLC is a limited liability company organized under the laws of Delaware ("Reckitt"); Reckitt Benckiser LLC d/b/a RB HyHo ("RB HyHo") is a limited liability company organized under the laws of Delaware; and Mead Johnson & Company LLC ("Mead Johnson" and, collectively with Reckitt and RB HyHo, the "Reckitt Entities") is a limited liability company organized under the laws of Delaware.  The Reckitt Entities are affiliates and subsidiaries of Reckitt Benckiser Group PLC, a multinational consumer goods company headquartered in England that produces health, hygiene and nutrition products.  Prior to the Petition Date, the Reckitt Entities were some of the Debtors' largest suppliers.

42.     In 2018, Reckitt obtained Series A Preferred Units of Holdings and, in connection therewith, was provided the right to nominate 1 member to the Board.  In 2018, Reckitt nominated Nitish Kapoor, an individual based in London, England to the Board.  In November 2020, Reckitt replaced Mr. Kapoor with Arjun Purkayastha, an individual based in London, England.  Subsequently, Reckitt obtained Series B and Series B-1 Preferred Units of Holdings.

43.     Reckitt is also a Term Lender.  In April 2022, Reckitt was provided the right to nominate 2 members to the Board.  Reckitt nominated Mr. Purkayastha to the Board and left the remaining seat vacant.

44.     **McKesson Entities**.  Upon information and belief: Defendant McKesson Ventures LLC ("McKesson Ventures") is a limited liability company organized under the laws of Delaware.  McKesson Ventures is a venture investment fund for health care start-ups, based in San Francisco, California.  It is a corporate affiliate of McKesson Medical-Surgical Minnesota Supply Inc. ("McKesson Minnesota"), a corporation organized under the laws of Minnesota.  McKesson Ventures and McKesson Minnesota are wholly owned subsidiaries of McKesson Corporation,

d/b/a McKesson Medical ("McKesson Medical"), a wholesale supplier of medical supplies and equipment, that employs tens of thousands and delivers a third of all pharmaceuticals used in North America. Prior to the Petition Date, McKesson Medical and McKesson Minnesota were among the Debtors' largest suppliers.

45. In 2018, McKesson Ventures obtained Series A Preferred Units of Holdings and, in connection therewith, was provided the right to nominate 1 member to the Board. McKesson Ventures nominated Thomas Rodgers, an individual resident of the State of Texas, to the Board. In November 2020, McKesson Ventures replaced Mr. Rodgers with Carrie Williams, an individual resident of the State of Massachusetts. McKesson Ventures is also a Term Lender.

46. **Sealed Air Entities**. Upon information and belief: Defendant Sealed Air Corporation (US) ("Sealed Air") is a corporation organized under the laws of Delaware. Defendants Shanklin Corp. ("Shanklin") and Automated Packaging Systems ("APS" and collectively with Sealed Air and Shanklin, the "Sealed Air Entities") are subsidiaries of Sealed Air and are corporations organized under the laws of Delaware. The Sealed Air Entities are headquartered in Charlotte, NC and known for their brands including Bubble Wrap. Prior to the Petition Date, the Sealed Air Entities were some of the Debtors' largest suppliers of packaging materials. Shanklin is also a Term Lender

47. In 2018, Sealed Air obtained Series A Preferred Units of Holdings and, in connection therewith, was provided the right to nominate 1 member to the Board. Subsequently, Sealed Air obtained Series B Preferred Units of Holdings.

48. **Scott Emerson and Emerson Entities**. Upon information and belief: Defendant the Emerson Group ("Emerson Group") is a limited liability company organized under the laws of Delaware. Emerson Group is a consulting and investment firm that provides sales

support, customer service, logistics, and marketing services to retailers and is headquartered in Wayne, PA. Scott Emerson is the Chief Executive Officer of Emerson Group. Emerson Healthcare LLC ("Emerson Healthcare" and, together with Emerson Group, the "Emerson Entities") a subsidiary of Emerson Group, is a limited liability company organized under the laws of Delaware. Prior to the Petition Date, the Emerson Entities provided products and various consulting and support services to the Debtors.

49.     In 2018, Mr. Emerson obtained Series A Preferred Units of Holdings. Subsequently, Mr. Emerson also obtained Series B-1 Preferred Units of Holdings. In connection with obtaining the Series B-1 Preferred Units of Holdings, upon information and belief, Mr. Emerson was appointed as an advisor to the Board, effective as of January 2021. Mr. Emerson is also a Term Lender.

50.     **Term Loan Agent**. Upon information and belief: Defendant Alter Domus (US) LLC is a limited liability company organized under the laws of the state of Delaware. Alter Domus (US) LLC is the agent (the "Term Loan Agent") under the Debtors' term loan agreement.

## V.     FACTUAL BACKGROUND

### A.     The Debtors' Origins

51.     In the late 2000s, Vagenas and Tramunti opened a pharmacy in the Bronx, New York. While the pharmacy initially struggled, sales improved after Mr. Vagenas started providing customers free scratch-off lotto tickets as a promotion. Mr. Vagenas contemplated expanding but, in 2009, instead began exploring a side business in e-commerce. With access to over-the-counter products through the pharmacy, Mr. Vagenas decided to sell such products online.

52.     To pursue this online business, in or about 2010, the Original Founders formed Pharmapacks, each holding a 33% interest.

53.     Based on subsequent statements by Mr. Vagenas, the Original Founders

business model was based on a belief that the future of e-commerce would be virtual malls, not standalone websites. In order to meet future demand in this new, on-line purchasing environment, the Original Founders decided that they needed to (i) build their business model around Amazon and eBay; (ii) establish logistics and fulfillment capabilities, shipping directly to consumers; and (iii) create their own technology software to provide a competitive edge.

54. The Original Founders raised $750,000 to start the Pharmapacks business, open a 3,000 square foot warehouse in Queens, build the original Pharmapacks website and begin selling products through Amazon and eBay.

55. For the first several years, Pharmapacks bought merchandise from certain distributors and sold it on Amazon and eBay. Unlike sales at a pharmacy, Pharmapacks did not need to stock full lines of products. Instead, the company sold whatever its suppliers had in stock. When a customer ordered a product, Pharmapacks would order it from the supplier, pick it up and then pack and ship it.

56. During these early years, while Pharmapacks was not profitable, it experienced modest growth in sales.

**B.** **Holdings' Formation and Involvement of Webb, Berkowitz and Quality King**

57. On July 15, 2014, the Original Founders formed Entourage, which later became Holdings, and transferred their full membership interests in Pharmapacks to Entourage. Upon information and belief, each of the Original Founders contributed ███████ for their equity interests in Entourage.

58. In or about 2014, Mr. Vagenas met Mr. Webb, who had a similar business called StocknGo. Mr. Webb had various connections with distributors. Most notably, Mr. Webb was related to Glenn Nussdorf, the CEO of the Quality King Entities.

59. On August 18, 2014, Holdings entered into a contribution agreement with

Webb, Berkowitz and Quality King ████████████████████████████ of the common equity of Holdings. Quality King contributed ████ and Webb and Berkowitz each contributed ████████. Pursuant to the contribution agreement, Quality King also agreed to provide ████████ ████████████████████████████████████████████████████████████.

60.     Quality King is one of the largest distributors of pharmaceuticals, health, and beauty care products in the United States. Quality King is known as a "Retail Diverter." Retail Diverters operate at the fringe of the mainstream distribution channels and "divert" the sale of merchandise intended for a particular, premium distribution channel into another, alternate distribution channel, often at steep discounts. Importantly, the selling practices of Retail Diverters are executed without the knowledge or permission of the primary manufacturer. Diversion can occur in a number of ways, including bulk purchases at volume discounts or through foreign channels. The end result is the unauthorized sale of merchandise at a discount through distribution channels neither anticipated nor authorized by the original, primary manufacturers of branded products. The power and reach of online platforms, such as Amazon and eBay, however unintentional, has enhanced the ability of Retail Diverters to quickly resell products obtained under false pretenses.

61.     Quality King has spent decades disrupting retail behind the scenes and is regarded as the largest and most successful Retail Diverter, acquiring goods cheaply in the open market and then reselling them. Quality King has been named in dozens of lawsuits regarding such practices, including price gouging litigation during COVID.[12]

62.     With Holdings, and its focus on selling products through Amazon and eBay,

---

[12]     For example, Quality King settled a case brought by the New York Attorney General as a result of its price gouging at the beginning of the COVID-19 pandemic. *See* NY AG Recovers $100K In Lysol Price-Gouging Case, Khadrice Rollins, Law360, (May 22, 2023), https://www.law360.com/articles/1680273/ny-ag-recovers-100k-in-lysol-price-gouging-case

Quality King found an ideal business partner. Through this partnership, Quality King enjoyed the torrid economic benefits of these shadow distribution markets with the added kicker of a significant equity position. As noted by Mr. Vagenas publicly, Holdings was constantly bombarded by primary manufacturers of branded products insisting that the company take their products off the company's websites. Originally, Holdings would comply with these requests, but as it became more emboldened, Holdings ignored them and continued selling diverted products.

## C.     Holdings' Expansion

63.    Holdings' partnership with Webb, Berkowitz, and Quality King was a primary driver of growth because Holdings was able to gain a competitive edge on Amazon and eBay by pricing product that was sourced from Quality King at discounts. Holdings funded this expansion through an August 24, 2014 revolving loan agreement with Quality King in an initial amount of ██████████ (the "QK Loan").

64.    Sales of approximately ██████████ in 2013, increased to ██████████ in 2014 and to ██████████ in 2015. However, despite this significant sales growth over the period from 2013 – 2015, Holdings was not profitable and incurred net losses of ██████████ in 2015.

65.    In 2015, Holdings explored options to further expand its business by directly partnering with product producers, representing a significant shift from its original model. In 2016, Holdings partnered with Reckitt and, over the next several years, with other producers such as Johnson & Johnson and McKesson Ventures, and Sealed Air and Emerson Group for packaging and logistics.

66.    Through these new partnerships, Holdings began to stray from its original business model and began to accumulate a significant amount of inventory. Ramping revenue in 2016 and 2017 led to significant inventory increases of ██████████ and ██████████ by the end of 2016 and 2017 respectively. Holdings was not equipped to manage this volume of inventory and,

upon information and belief, did not implement an inventory management system capable of effectively managing its inventory, including inventory with specific expiry dates. Typically, an enterprise with an inventory stock with specific, and relatively short expiration dates, would implement a system to ensure that its shortest dated inventory is sold first. Upon information and belief, Holdings could not effectively track the inventory it had in stock, and without a proper inventory management system, Holdings could not prioritize the product it was shipping out.

67. As Holdings expanded its marketing partnerships, sales rose to ███████ in 2016 and ███████ in 2017. However, as sales growth ramped, operating losses persisted. Holdings generated net losses of ███████ and ███████ in 2016 and 2017 respectively.

68. At the same time, Holdings' debt obligation to Quality King grew. The QK Loan balance increased to ███████ in 2016 and ███████ in 2017. During this time, Holdings maintained dangerously low cash. As of December 31, 2016, Holdings had only ███████ of cash. As of December 31, 2017, Holdings' cash balance was only ███████.

**D.** **Holdings Operating Agreements**

69. The provisions of the Debtors' operating agreements referenced in this Complaint have been substantially similar since 2018 through the Petition Date. The language cited herein is from The Packable Holdings, LLC Amended and Restated Limited Liability Company Agreement dated April 14, 2022, but is contained in the Debtors' operating agreements from 2022 through the Petition Date (collectively, the "Operating Agreements").

70. The Operating Agreements provide, in section 6.2, that the Board of Holdings may designate individuals as officers. Specifically, section 6.2 states:

The Board may from time to time designate individuals as officers .

. . of the Company,[13] and any such Officers shall have such authority and perform such duties as the Board may from time to time delegate to them and shall serve at the will of the Board. . . .The officers of the Company and its Company Subsidiaries, in the performance of their duties as such, shall owe to the Company and its Company Subsidiaries fiduciary duties (including duties of loyalty and due care) of the type owed by an officer or a corporation to such corporation and its stockholders under the laws of the State of Delaware.

Operating Agreements at § 6.2.

71.　　Section 6.1(i)(i) of the Operating Agreements limits Manager personal financial liability for breach of fiduciary duties stating:

each Manager shall owe, and shall act in a manner consistent with, fiduciary duties to the Company and its Members of the nature, and to the same extent, as those owed by directors of a Delaware corporation; provided, that, to the fullest extent permitted by law, . . .each Manager of the Company shall not be *personally* liable to the Company or its members for *monetary* damages for breach of fiduciary duty as a . . . Manager."

Operating Agreements at § 6.1(i)(i) (emphasis added).

72.　　Nothing in this Complaint shall be construed as seeking monetary damages against the individual Managers for breaching their fiduciary duty while acting solely in their capacity as Managers. However, section 6.1(i)(i) specifically does not exculpate any Manager for non-monetary damages and/or equitable relief stemming from a breach of fiduciary duty. As a result, the Committee is seeking all available non-monetary relief, including without limitation, injunctive and declaratory relief that invalidates and seeks the recission and return of redemption payments and Term Loans, recharacterization of the Term Loans as equity, and rescission of all transfers received by the Managers and/or the Intervening Entities (defined below) in which the

---

[13] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Operating Agreements.

Managers are agents.

73.     At all relevant times, since 2018, Vagenas, Tramunti, Mastronardi, Berkowitz, Webb, and Glenn Nussdorf (collectively, the "Human Controllers") each controlled the entities with which they were involved, as set forth in allegations paragraphs 32-50 (collectively, the "Intervening Entities").

74.     As set forth below, the Human Controllers engaged directly and indirectly in interested transactions with the Debtors and are liable for breach of fiduciary duty.  Each Intervening Entity, as a direct or indirect beneficiary of the Human Controllers' breach of fiduciary duty, is liable for the damages caused by the Human Controllers' breach of fiduciary duty.  Each Human Controller, as a direct or indirect beneficiary of the Human Controller's breach of fiduciary duty, is liable for the damages caused by their breach of fiduciary duty.

75.     The Intervening Entities are mere instrumentalities of the Human Controllers.  As such, the respective Intervening Entity is the alter ego of the Human Controller.  Therefore, in addition or in the alternative to holding the Human Controller liable, the entity veil may be pierced to also hold the Intervening Entity liable for the acts of the Human Controller.

76.     Upon information and belief, defendants Nitish Kapoor, Arjun Purkayastha, Thomas Rodgers, Carrie Williams, and Glenn Nusdorf acted as an agent of the Members  that appointed each of them to the Board of Managers, to serve as one of the Managers.  Specifically, Nitish Kapoor was an agent for RB Health (US) LLC aka Reckitt, Arjun Purkayastha was an agent for RB Health (US) LLC aka Reckitt, Thomas Rodgers was an agent for McKesson Ventures LLC, Carrie Williams was an agent for McKesson Ventures LLC, and Glenn Nusdorf was an agent for Quality King.  As such, each underlying entity (RB Health (US) LLC aka Reckitt, McKesson

Ventures LLC, and Quality King) —each a defendant herein—is responsible for the acts of its agent taken in breach of the respective fiduciary duty.

77.     The Operating Agreements acknowledge that certain of the Debtors' Members may compete with the Debtors' businesses, but such competition does not:

> relieve (1) any Member from liability associated with the unauthorized use or disclosure of the Company's confidential information obtained pursuant to [the Operating] Agreement or (2) any Manager or Officer from any liability associated with his or her duties and obligations (including his or her fiduciary duties) to the Company, including any obligations as a Covered Person.

Operating Agreements at § Section 6.1(i)(iii).

78.     The Operating Agreements further impose confidentiality requirements on each Member and Manager of the Debtors in section 13.6, which states, in pertinent part:

> Each Member and Manager agrees that such Member and Manager, as applicable, will keep confidential and will not disclose, divulge, or use for any purpose (other than to monitor its investment in the Company) any confidential information obtained from the Company pursuant to the terms of this Agreement or otherwise.

Operating Agreements at § 13.6.

79.     The Operating Agreements further restrict who may receive certain competitively sensitive information in section 15.6 of the Operating Agreements, which states, in pertinent part:

> Notwithstanding anything in this Agreement to the contrary, no Member (other than Carlyle) shall be entitled to receive any Competitively Sensitive Information.

Operating Agreements at § 15.6.

**E.      The 2018 Preferred Stock Issuance**

80.     While the Founders and Quality King continued to push an aggressive growth strategy, continuing losses were not sustainable. ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████ ,██████████

81. As the pattern of unprofitable growth persisted from 2015 to 2017, operating losses were funded with a significant increase in debt. By the end of 2018, the balance of the QK Loan had increased to ████████ and, based on information and belief, Quality King had become unwilling to fund continued losses.

82. Unable to raise traditional financing, and with the Founders and Quality King either unwilling or unable to fund continued losses, Holdings looked to existing suppliers to raise equity capital.

83. In June 2018, Holdings amended its LLC Agreement to authorize the issuance of 212.5 Series A preferred units (the "Series A Units") and entered into a Series A Purchase Agreement. The Series A Units were to be issued at a unit price of ████████ with a ████████ liquidation preference.

84. Holdings initially sold ████ Series A Units. Participants in the Series A Unit offering included Reckitt (████████ McKesson Ventures (████████ Sealed Air (████████ and Mr. Emerson (████████). The 2018 Series A Unit offering generated $32.5 million. The stated use of these proceeds under the Series A Purchase Agreement was ████████████████ ████████████████████████████████████████

85. In addition, Holdings amended its LLC agreement to expand the Board of Managers to nine members. Vagenas, Webb, Berkowitz, Tramunti, Mastronardi and Nussdorf each held one seat. Nussdorf was ██████████████████████████████ despite his significant influence over Holdings. In connection with their purchase of Series A Units, Reckitt, McKesson Ventures, and Sealed Air were each entitled to nominate one member to the Board of Managers.

86. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

87.  From 2018 through 2019, Holdings' pattern of unprofitable growth persisted. Holdings' sales increased to $203 million but net losses increased to $19.5 million. Holdings inventory stock also grew to ████████████ By the end of 2019, net sales increased to $247 million but net losses increased to $32.5 million, while inventory increased to ████████

**F.  February 2020 Stock Split and Need for Additional Capital**

88. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

| Holder | Number of Units |
|---|---|
| Quality King | ████████ |
| Castle Ridge (Vagenas) | ████████ |
| Milend (Tramunti) | ████████ |
| Webb | ████████ |
| Berkowitz | ████████ |
| PPJDM (Mastronardi) | ████████ |

89. ██████████████████████████████████

| Holder | Number of Units |
|--------|-----------------|
| ███ | ██████ |
| ██ | ████ |
| ███████████ | ████ |
| █████ | ████ |

90.    At this time, the Founders and Quality King began exploring the possibility of an initial public offering to cash in on their minimal initial investments. To do so, however, Holdings had to demonstrate its ability to continue to grow. To fuel this growth, Holdings (i) looked to expand its business with Walmart; and (ii) participated in the Amazon Seller Fulfilled Prime program.

91.    The Amazon program allowed sellers to fulfill orders directly from their own warehouses, but sellers had to fulfill orders with two-day delivery. While this program presented significant upside, it was also incredibly costly. At the time, Holdings only had warehouse capacity in New York and cross-coast orders were expensive, requiring air shipment.

92.    The Amazon program, therefore, required a significant expansion including a west coast distribution center (the "West Coast Expansion"). The capital investment required to achieve this was, however, substantially beyond Holdings' means. Holdings needed another new partner to continue to drive sales, fund continuing losses and now provide additional capital to fund a substantial expansion of Holdings' infrastructure.

93.    In June 2020, Holdings entered into a ███████ term loan facility with ███ ███████████████████████ and on July 24, 2020, Holdings entered into a $75 million ABL facility (the "ABL Facility") with JPMorgan Chase Bank, N.A. ("JPMC"), as agent and lender. ███

████████████████████████████████████████████████████████

████████████████████████████████████████████

## G.    Carlyle and the 2020 Series B Offering

94.    Holdings therefore looked to bring in a new investor to fund continuing losses and expand Holdings' operations, including the West Coast Expansion, with the ultimate goal of going public.  In late 2020, Holdings found its outside investor in The Carlyle Group, Inc. ("Carlyle").

95.    On November 6, 2020, Holdings entered into a Series B Sale Agreement to sell Series B Preferred Units (the "Series B Units") to Carlyle at a price of $60.2527 per unit and Series B-1 Preferred Units (the "Series B-1 Units") at a price of $35.6397 per unit.  Simultaneously, Holdings amended its LLC agreement to authorize the issuance of approximately 5 million Series B Preferred Units and 1.14 million Series B-1 Preferred Units.  Carlyle acquired 3,577,961 Series B Units for $215,581,832.66.

96.    In December 2020, Carlyle agreed to buy 750,000 additional shares of Series B Units for the same price, for a total investment of $260,771,357.66.

97.    The Carlyle investment was intended to achieve two principal goals.  On the one hand, the transaction addressed Holdings' pressing, short-term liquidity crisis, providing Holdings with capital to implement the West Coast Expansion and cover operating losses. The investment was also intended to lay the foundation for a longer-term strategy to allow the company access to the public equity capital market and provide sufficient liquidity to carry Holdings to a near-to medium-term initial public offering.

98.    In reality, the Series B investment was insufficient to meet Holdings' capital needs and did not provide the foundation for a successful "go public" transaction.  By the end of 2020, Holdings required far in excess of $260 million, which amount was further depleted by the insiders' self-dealing, to stem years of mounting losses and fix significant operational problems

fueled by rampant mismanagement. ███████████████████     ███████

███████████████████

### H.  The Series B Proceeds are Consumed by Self-Dealing

99.     Simultaneously with the Carlyle investment, the Founders and Nussdorf looked to utilize their insider status to cash in on their original investments in Holdings.   On November 6, 2020, a conflicted Board authorized the use of the Series B proceeds to redeem membership units from existing members in exchange for approximately $60 million (the "Redemption Payments").  ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

| Holder | Number of Units | Cash Contribution | ███████Amount |
|---|---|---|---|
| Quality King | ██████ | ██████ | ██████ |
| Castle Ridge (Vagenas) | ██████ | ██████ | ██████ |
| Milend (Tramunti) | ██████ | ██████ | ██████ |
| Berkowitz | ██████ | ██████ | ██████ |
| Webb | ██████ | ██████ | ██████ |
| PPJDM LLC (Mastronardi) | ██████ | ██████ | ██████ |

100.    Effective as of the closing of the Series B sale, Holdings' LLC Agreement was further amended to reconstitute the Board.  Mr. Vagenas held 1 seat and had the right to appoint 2 others, which he filled with Berkowitz and Tramunti.  Reckitt, McKesson Ventures, and Sealed Air each were entitled to appoint one member.   Carlyle was entitled to appoint 2 members.  The final seat was occupied by Deborah International, an entity controlled by Glenn Nussdorf.

101. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

102. These self-interested ███████████████████████ consumed over ████ ████ of Series B proceeds, severely limiting the company's ability to address its long-term capital needs and left Holdings with unreasonably small, inadequate capital. The remaining Series B proceeds were insufficient to fund the West Coast Expansion, address operational issues and mounting losses, and maintain liquidity to go public. The Redemption Payments were made at a time when the Debtors were unprofitable and in need of substantial liquidity to pursue the West Coast Expansion, a rampant hiring spree, address basic operational deficiencies and fund an overall growth strategy that was the cornerstone of an anticipated SPAC transaction. Rather than utilize the proceeds of the Series B Units to fund this expansion or to make the company profitable, the recipients of the Redemption Payments utilized their control of the Debtors to authorize the Redemption Payments for their own personal gain with the intent to hinder, delay or defraud non-insider current and future creditors of the Debtors.

103. Undeterred, Holdings continued down its value destructive path. Holdings' inventory stock ballooned from ██████████████████████ with net product cost soaring from ██████████████████████████ Not surprisingly, ████████ of such costs were from insider suppliers. In 2020, Holdings paid approximately ██████████ in interest and fees related to the repayment of related party loans and ██████████ in rent to Quality King for its Ronkonkoma, NY warehouse facility.

104. Holdings' Audited Consolidated Financial Statements for December 31,

2020, issued by Baker Tilly in May 2021 ████████████████████████████████████████

████████████████████████████ However, only 5 months later, in October 2021, Deloitte &

Touche LLP audited Holdings' consolidated balance sheets. ████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████

## I. The Debtors Pursue a SPAC Merger with Highland and an Aggressive Growth Strategy to Inflate Valuation

105.    Holdings started preparing for an initial public offering immediately after

closing the Series B Unit sales.

106.    On June 20, 2021, the Debtors and Highland Transcend Partners I. Corp.

("Highland"), a special purpose acquisition company ("SPAC") formed in 2020, entered into a

letter of intent for a proposed business combination.  As a SPAC, Highland's purpose was to merge

with a target, such as Holdings, that could not withstand the SEC scrutiny to go public on its own.

107.    On September 9, 2021, the Debtors and Highland entered into a merger

agreement (the "Merger Agreement") to take the merged company public.  The newly formed

public company was projected to have an unsupportable enterprise value of $1.55 billion and an

equity value of $1.9 billion.  Based on this valuation, existing equity holders were expected to

receive 70.5% of the new equity and the insider-Defendants were slated to receive their respective

shares of $1.346 billion in equity value if the SPAC merger closed.

108.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████ Simultaneously with executing the Merger Agreement, Holdings issued $110 million in unsecured convertible notes (the "Notes"). The liquidity from the Notes, however, was only enough to keep Holdings afloat until the merger closed.

109. Holdings continued pursuing an aggressive growth strategy to drive sales to justify the inflated SPAC valuation that was not supported by Holdings' operational and financial performance. Driven by the hope of outsized returns on their equity through the SPAC, the Board failed to address Holdings' lack of profitability and instead authorized a spending spree to continue to drive sales numbers. Holdings entered into two new leases for an even larger warehouse facility in New York (the "Wilshire Facility") and a new warehouse facility in California (the "Harvill Facility"). Both facilities required significant capital outlay to retrofit the facilities for Holdings' needs.

110. Holdings further expanded its workforce to 1,300 employees and launched a rebranding campaign, adding to an already unsustainable cost structure.

111. ████████████████████████████████████████████████████████████████████████████████████████████████████

112. The Board-authorized spending had dire consequences. For the first nine months of 2021 leading up to the Merger Agreement, Holdings sustained a net loss of ████████. While Holdings had raised $110 million from the Notes in September, by December 2021, net losses grew to $175 million.

113. Holdings and the Board knew, or should have known, that this spending was unsustainable and would lead to economic ruin if the SPAC transaction failed to close. Deloitte's audited consolidated financial statements for Holdings as of December 31, 2021

██████████████████████     ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

114.   ██████   ████████   ████████   ████████   ████████   ████████

██████████   ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████ .

████████████████████████████████████

## J.   <u>Continued Deterioration of the Business and SPAC Termination</u>

115.   By February 2022, just five months after entering into the Merger Agreement, Holdings had substantially exhausted over $320 million of preferred equity capital and $110 million of Notes proceeds.  Holdings was falling behind on payables, including to the insider vendors who were taking notice.  Holdings was also on the cusp of defaulting under the ABL Facility, which would trigger JPMC's right to exercise dominion over cash.

116.   In early February 2022, the Board acknowledged the need for additional funding.  Due to restrictions under the Merger Agreement, however, Holdings was only allowed to incur an additional $60 million of third-party debt, which was insufficient to fund the businesses' mounting losses.  Notwithstanding this precarious position, ██████████████████████████ ████████████████████████████████████████████████████████████ . ████████████████████████████████████████████ Instead, the Board forged ahead announcing the planned opening of their Harvill Facility on February 16, 2022.

117.   By early March 2022, the Board acknowledged they could not achieve the results they had promised when entering into the Merger Agreement.  Holdings had insufficient liquidity to meet its obligations and needed funding well in excess of the $60 million permitted under the Merger Agreement.

31

118. ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████

119. ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████

120. ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

121. ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████

████████████████████████████████
████████████████████████████████
█ █ █ █ █ ███ █ ██ █ █ ███ █ ███ █
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

122. ██████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

123.     By March 16, 2022, Holdings and Highland agreed to terminate the Merger Agreement and on March 24, 2022, executed a Termination and Release Agreement, whereby Holdings paid a breakup fee of $10 million: $2 million in cash, and $8 million of convertible notes.

## K.     Continued Deterioration and Efforts to Raise Further Capital

124.     Once the Merger Agreement was terminated in March 2022, Holdings was in crisis mode.  Holdings had exhausted hundreds of millions of dollars and still could not generate positive cash flow.  The promise of a significant inflow of new capital from a SPAC transaction was gone.  And while the restrictions of the Merger Agreement on Holdings' ability to raise new debt were lifted, Holdings had no prospect of raising the capital needed to complete its aggressive infrastructure build out.

125.     Given the liquidity crisis, Holdings engaged JP Morgan Chase Bank to try and find alternative funding.  Notwithstanding that Holdings was now free to solicit financing from any source following termination of the Merger Agreement, JP Morgan Chase Bank recognized that traditional debt financing would not be possible given the company's dire economic condition. As a result, JPMC, in consultation with the conflicted Board, only solicited financing proposals from existing investors and "key vendors," which were determined to be "the only realistic potential source of liquidity."  In doing so, the Board, which was dominated by Vagenas,

Berkowitz, Tramunti, Reckitt, McKesson, and Quality King, acknowledged that no reasonable investor or commercial lender would invest additional equity or extend additional debt to Holdings given its precarious financial position.

126.    Efforts to raise additional funds from the holders of the unsecured convertible Notes failed.  Holdings therefore turned to its existing equity holders and trade vendors, including Carlyle, the Founders, Quality King, Reckitt, and McKesson.  None of the existing equity holders were willing to put in any additional equity funding.

127.    ███████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████

128.    Carlyle shifted its focus to providing short-term liquidity and implementing a substantial cost-cutting program.  Negotiations on a new term loan commenced.

129.    ███████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████    ███████████████████████████████
███████████████████████████████████

130.    ███████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████    █████████████
████████████████████████████████████████████████████████

131. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

132. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ Yet, Sealed Air (via its subsidiary, Shanklin)

sought and received a conversion of pre-term loan unsecured receivables into secured term loans.

133. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ ████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

L.    **The Term Loan**

134.    On April 14, 2022, Holdings, as borrower, and the other Debtors, as

guarantors, entered into the Term Loan Credit Agreement (the "Term Loan") among the Debtors, the lenders party thereto, and Alter Domus (US) LLC as administrative agent. The lenders under the Term Loan consisted of Carlyle, Reckitt, Quality King, McKesson Ventures, Castle Ridge, Gioia, JFMW, Mr. Webb, 710 Holdings, Mr. Emerson, and Shanklin (collectively in their capacities as such, the "Term Lenders").

135. ███████████████████████████████████████████████

███████████████ However, the Term Loan was made in tranches and only committed the Term Lenders to provide an initial Tranche A loan of $86.7 million that was funded on April 14, 2022 (the "Tranche A Term Loan"). ████████████████████████

████████████████████████████████████████████████████

█████████

136. The Tranche A Term Loan only provided $77 million of new money, the majority of which was funded by Carlyle. A breakdown of the initial funding is set forth below:

| Lender | Amount |
|---|---|
| Carlyle | $50,000,000 |
| Reckitt | $12,500,000 |
| Quality King | $10,500,000 |
| McKesson Ventures | $2,500,000 |
| Vagenas | $1,000,000 |
| Tramunti | $300,000 |
| Mastronardi | $300,000 |
| Webb | $300,000 |
| Berkowitz | $300,000 |

137. The remaining $9 million, styled as a "Delayed Draw Commitment" was nothing more than the conversion of outstanding unsecured trade debt owing from the Debtors to Emerson Healthcare and Shanklin (the "Tranche A Roll Up"). In particular, Shanklin was permitted to convert $3,808,293.98 of outstanding trade payables under 2021 equipment purchase agreements, and Mr. Emerson was permitted to convert $5,144,640.57 of outstanding payables due to Emerson Healthcare.

138. While the Term Loan contemplated the possibility of additional tranches of up to $215 million, the funding of such tranches was fully discretionary and provided no actual commitment for additional liquidity.

139. In connection with the Term Loan, the Debtors, and the Term Loan Agent, in its capacity as collateral agent and administrative agent for the Term Lenders, entered into a Second Lien Pledge and Security Agreement dated as of April 14, 2022 (the "Security Agreement"). Pursuant to the Security Agreement, to secure the obligations under the Term Loan, the Debtors granted the Term Loan Agent second priority liens (the "Prepetition Liens") on certain of the Debtors' assets, with certain exclusions, including (i) leasehold interests; and (ii) equity interests in any entity other than wholly-owned subsidiaries ("Trade Service Equity"), including the Debtors' minority interest in an issuer that is a digitally native brand (a "Digitally Native Brand") not controlled by a Debtor.

140. The Term Loan Agent did not record a leasehold mortgage in the local office where any of the Debtors' real property was located. In addition, while commercial tort claims were included within the purported collateral to the extent specifically identified, no such commercial tort claims were identified in the schedules to the Security Agreement.

141. ███████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

142. ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████ ██

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████ ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████

143. ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████ ███ ████ ███ ███ ███ ████ █ ████ ████ ████

██████████████████████████████████████████████████

███████████

144. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

145.    After the Term Loan facility was executed, Vagenas resigned as ████████

████████████████████████████████████████████████

Former Carlyle executive Daniel Myers replaced him as CEO.

**M.    The Debtors' Continued Liquidity Crisis**
**and Refusal to Fund the Tranche B Term Loan**

146.    The funding under the Tranche A component of the Term Loan was woefully insufficient to maintain operations, let alone implement an effective turnaround. In fact, it took less than 3 months for the Debtors to fully exhaust the Tranche A funding.

147.    In late May, Holdings launched a rights offering to identify new participants in the Term Loan on the same terms as the Tranche A investment. The company received tepid results. ██████████████████████████████████████

████████████████████████████████████████████████

██████    In addition, the Debtors were facing a July 11 forbearance deadline under the ABL Facility.

148.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

149. ████████████████████████████████████████████████

150. ████████████████████████████████████████████████

151. ████████████████████████████████████████████████

████████████████████████████████████ Ultimately, the Debtors were forced into a liquidation process months before the Petition Date, as they burned through inventory with no ability to restock it. By July 2022, only 3 months after the Tranche A funding, Holdings was out of money. On July 21, 2022, the Term Lenders and Daniel Myers, through 5E Consulting LLC, provided an $8.7 million bridge loan (the "Bridge Loan") to allow Holdings time

to evaluate options. ██████████████████████████

██████████████████████████████████████████████████

██████████████████████████████

### N.     The One-Year Insider Payments

152.     Barely a month later, on August 28, 2022, the Debtors filed these cases to wind down their business and liquidate their assets.  The post-bankruptcy liquidation process failed to generate sufficient proceeds to fully pay off the more than $50 million balance of the ABL Facility.  The Debtors' efforts to liquidate inventory with a book value of over $70 million as of the Petition Date through normal business channels was ineffective.  After several months, the Debtors pivoted to a bulk sale auction process, which similarly failed to meet budgeted expectations. ████████████████████████████████████████

██████████████████████████████████████████████████

██████ ████████████████████████████████████████

██████

153.     In the year prior to the Petition Date, the Debtors' insider vendors received more than $70 million in payments constituting avoidable preferential transfers. ████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

The insider transfers made within the year of the Petition Date are reflected below and in the attached Exhibit A:

| Transferee | Amount |
|---|---|
| Quality King | $20,474,171.33 |
| Quality Fragrance | $8,292,876.90 |
| Ultra | $8,131,013.22 |
| Pro's Choice | $983,841.49 |
| Reckitt | $16,590,588.90 |
| RB HyHo | $7,661,163.60 |
| Mead Johnson | $2,502,581.26 |
| McKesson Medical and/or McKesson Minnesota | $3,434,746.98 |
| Sealed Air | $448,696.21 |
| APS | $259,725.56 |
| Emerson Healthcare | $1,843,243.91 |

## O. The Carlyle Settlement

154.    On May 13, 2023, the Term Loan Agent filed proofs of claim numbered 10219, 10220, 10221, 10222, 10223, and 10224 (collectively, the "Term Loan POCs") against each of the Debtors, each of which asserted a secured claim in the amount of $100,529,679.15, plus unliquidated amounts (the "Term Loan Claim Amount") in connection with the Tranche A Loan and Bridge Loan. Carlyle's portion of the Term Loan Claim Amount is $55,336,671.18 (the "Carlyle Claims").

155.    On September 28, 2023, the Committee and Carlyle entered into a settlement agreement (the "Settlement Agreement") to reduce and allow the Carlyle Claims. In particular, (a) Carlyle agreed to: (i) for purposes of distributions in connection with the Debtors' bankruptcy cases, waive and release any secured claim Carlyle has under the Term Loan

Documents or any other agreements with respect to any claims against the Debtors; and (ii) reduce the amount of its claims against the Debtors to $27,668,335.59 (the "Remaining Carlyle Claim Amount"); and (b) Carlyle and the Committee agreed to the allowance of a general unsecured claim for the benefit of Carlyle against each of the Debtors in the amount of the Remaining Carlyle Claim Amount (the "Allowed Carlyle Claim").

156.    As a result of the Settlement Agreement, the Term Loan Claim Amount was reduced to $72,861,343.56 (inclusive of the Allowed Carlyle Claim) (the "Alleged Secured Term Loan Claim").  The Committee reserved all of its rights to object to the Alleged Secured Term Loan Claim and the Term Loan POCs, as amended (other than the Allowed Carlyle Claim), or otherwise raise a Challenge under the Final Cash Collateral Order against the other Term Lenders (the "Remaining Term Lenders"), other than any Challenge (i) against Carlyle and its affiliates, including Carlyle Partners VII Pacer Holdings, L.P. or (ii) that would have the effect of reducing or disallowing the Allowed Carlyle Claim.

157.    On September 28, 2023, the Committee filed the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order (I) Approving a Settlement Pursuant to Federal Rule of Bankruptcy Procedure 9019; and (II) Granting Related Relief* (the "9019 Motion") seeking approval of the Settlement Agreement with Carlyle.[14]  The 9019 Motion was approved on October 24, 2023.[15]

## COUNT I
## DECLARATORY JUDGMENT THAT THE PREPETITION
## LIENS DO NOT ATTACH TO THE DEBTORS' LEASEHOLD INTERESTS
(against Term Loan Agent)

158.    The Committee repeats and realleges each and every allegation in the

---

[14] Docket No. 1025.

[15] Docket No. 1098.

preceding paragraphs as if fully set forth herein.

159.    Under the Security Agreement, leasehold interests are excluded collateral and, therefore, are not subject to the Prepetition Liens.

160.    Upon information and belief, the applicable leases governing the Debtors' leasehold interests either (i) prohibit the granting of a lien in such leasehold interests; and/or (ii) require the applicable landlord for such lease to consent to the grant of a lien in such leasehold interest, which consent was not given.

161.    The leasehold interests were not pledged to the Term Loan Agent and, therefore, the Term Loan Agent does not hold a Prepetition Lien on the leasehold interests.

162.    A present, justiciable controversy exists regarding whether the Prepetition Liens attach to the leasehold interests and any proceeds thereof.

163.    This Court is authorized to resolve this dispute pursuant to section 506 of the Bankruptcy Code and Bankruptcy Rule 7001(2) and (9).

164.    The Committee is entitled to a declaration that the Prepetition Liens do not attach to the Debtors' leasehold interests and the proceeds thereof.

## COUNT II
### AVOIDANCE OF UNPERFECTED LIENS IN LEASEHOLD INTERESTS
(against Term Loan Agent)

165.    The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

166.    The Term Loan Agent did not file, nor did they have authority to file, leasehold mortgages against any leasehold interest in the county where such leasehold interest was located, as is required to perfect an interest in a leasehold interest.

167.    In order to perfect a security interest in a leasehold interest, the Term Loan

Agent was required to file a leasehold mortgage in accordance with applicable law.

168. As of the Petition Date, the prepetition liens of the Term Loan Agent were unperfected against the Debtors' leasehold interests.

169. The Committee is entitled, under section 544(b) of the Bankruptcy Code, to a judgment avoiding any Prepetition Lien against the Debtors' leasehold interests and their proceeds.

## COUNT III

### DECLARATORY JUDGMENT THAT THE PREPETITION LIENS DO NOT ATTACH TO THE TRADE SERVICE EQUITY AND DIGITALLY NATIVE BRANDS
(against Term Loan Agent)

170. The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

171. Under the Security Agreements, Trade Service Equity and the Debtors' equity interests in Digitally Native Brands are excluded collateral and, therefore, are not subject to the Prepetition Liens.

172. The Trade Service Equity and the Debtors' equity interests in Digitally Native Brands were not pledged to the Term Loan Agent and, therefore, the Term Loan Agent does not hold a Prepetition Lien on Trade Service Equity and the Debtors' equity interests in Digitally Native Brands.

173. A present, justiciable controversy exists regarding whether the Prepetition Liens attach to the Trade Service Equity and the Debtors' equity interests in the Digitally Native Brands, and any proceeds thereof.

174. This Court is authorized to resolve this dispute pursuant to section 506 of the Bankruptcy Code and Bankruptcy Rule 7001(2) and (9).

175.    The Committee is entitled to a declaration that the Prepetition Liens do not attach to the Trade Service Equity and the Debtors' equity interests in the Digitally Native Brands, and the proceeds thereof.

## COUNT IV
### AVOIDANCE OF UNPERFECTED LIENS IN TRADE SERVICE EQUITY AND DIGITALLY NATIVE BRANDS
(against Term Loan Agent)

176.    The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

177.    The Term Loan Agent did not file, nor did they have authority to file, financing statements to perfect a lien in the Trade Service Equity or the Debtors' equity interests in the Digitally Native Brands.

178.    In order to perfect a security interest in Trade Service Equity or the Debtors' equity interests in the Digitally Native Brands, the Term Loan Agent was required to file a UCC-1 financing statement.

179.    As of the Petition Date, the Prepetition Liens of the Term Loan Agent were unperfected against Trade Service Equity or the Debtors' equity interests in the Digitally Native Brands.

180.    The Committee is entitled, under section 544(b) of the Bankruptcy Code, to a judgment avoiding any Prepetition Lien against the Debtors' Trade Service Equity, the Debtors' equity interests in the Digitally Native Brands, and/or any proceeds thereof.

## COUNT V
### DECLARATORY JUDGMENT THAT THE PREPETITION LIENS DO NOT ATTACH TO AVOIDANCE ACTIONS
(against Term Loan Agent)

181.    The Committee repeats and realleges each and every allegation in the

preceding paragraphs as if fully set forth herein.

182. An estate's rights and claims under chapter 5 of the Bankruptcy Code (collectively, "Avoidance Actions") do not come into existence until a debtor files a petition for relief under the Bankruptcy Code.

183. A bankruptcy trustee (or other authorized party), on behalf of all creditors, has sole authority to pursue Avoidance Actions.

184. Accordingly, Avoidance Actions and their proceeds are not subject to the Prepetition Liens.

185. A present, justiciable controversy exists regarding whether the Prepetition Liens attach to the Avoidance Actions or their proceeds.

186. This Court is authorized to resolve this dispute pursuant to section 506 of the Bankruptcy Code and Bankruptcy Rule 7001(2).

187. The Committee is entitled to a declaration that the Prepetition Liens do not attach to the Avoidance Actions and their proceeds.

## COUNT VI
## AVOIDANCE OF UNPERFECTED LIENS IN COMMERCIAL TORT CLAIMS
(against Term Loan Agent)

188. The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

189. Neither the Security Agreement, the Security Agreement schedules, nor any other related security document executed in connection with the Term Loan describes any specific commercial tort claims.

190. Upon information and belief, the Security Agreement schedules were never amended to add any commercial tort claims.

191. None of the UCC-1 financing statements filed by the Term Loan Agent against the Debtors describe any specific commercial tort claims.

192. In order to perfect its Prepetition Liens against the Debtors' commercial tort claims, the Term Loan Agent was required to describe such commercial tort claim in the Term Loan documents, file UCC-1 financing statement, or both.

193. As of the Petition Date, the Prepetition Liens were unperfected against the Debtors' commercial tort claims.

194. The Committee is entitled, pursuant to section 544(b) of the Bankruptcy Code, to a judgment avoiding any Prepetition Lien against the Debtors' commercial tort claims and their proceeds.

## COUNT VII

### AVOIDANCE OF ███████████
### PURSUANT TO 11 U.S.C. § 548(a)(1)(A)
(against Quality King, Reckitt, McKesson Ventures, Scott Emerson, Emerson Healthcare, and Shanklin)

195. The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

196. ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████ ███

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████.

197. ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████.

198. ██████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████

199. Based upon the foregoing, the ██████████████████ pursuant to 11 U.S.C. § 548(a)(1)(A).

## COUNT VIII

### AVOIDANCE OF ████████████
### PURSUANT TO 11 U.S.C. § 548(a)(1)(B)
(against Quality King, Reckitt, McKesson Ventures, Scott Emerson, Emerson Healthcare, and Shanklin)

200. The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

201. ████████████ was made to, or for the benefit of, ████████████████ within two years of the Petition Date.

202. ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████

203. 

204.    Based upon the foregoing, ███████████████ pursuant to 11 U.S.C. § 548(a)(1)(B).

**COUNT IX**

**RECHARACTERIZATION OF DEBT TO
EQUITY PURSUANT TO 11 U.S.C. § 105(a)**
(against Term Loan Agent, Reckitt, Quality King, McKesson Ventures, Vagenas, Castle Ridge, Tramunti, Gioia, Mastronardi, JFMW, Webb, Berkowitz, 710 Holdings, Emerson, and Shanklin)[16]

205.    The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

206.    Against the backdrop of the facts and circumstances alleged above, the Committee requests that the Court, in the exercise of its equitable powers, recharacterize as equity the alleged debt reflected in the Alleged Secured Term Loan Claim.

207.    The focus of recharacterization is whether the parties called an instrument one thing when, in fact, it was intended as something else. The parties' intent is determined from their words and actions, as well as the commonsense evaluation of the economic reality of the circumstances surrounding the transactions in question.

208.    The question is whether the party infusing the funds did so as a lender (expecting to be repaid with interest regardless of the receiving party's fortunes) or as an investor (with its expectation of repayment tied directly to the receiving party's fortunes).

---

[16]    Pursuant to the Settlement Agreement, the Committee is not asserting this Count against Carlyle, nor is it seeking to recharacterize the Allowed Carlyle Claim.

209.     The paradigmatic recharacterization case involves a situation where the same individuals or entities, or affiliates of such entities, control both the transferor and the transferee, and inferences can be drawn that funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims.

210.     The facts and circumstances alleged above demonstrate that the Term Loan Agent and Remaining Lenders advanced the funds to the Debtors not as lenders but as investors, with the parties understanding and intending that the Term Lenders would be repaid when the business stabilized and improved, allowing the Debtors to consummate the IPO.

211.     The Term Loan was approved by a conflicted Board, which was controlled directly or indirectly by the Remaining Term Lenders, each of whom held a substantial equity position in Holdings.

212.     ███████████████████████████████████████████
███████████████

213.     ███████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████     █████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████

214.     The Remaining Term Lenders knew the Debtors had no ability to obtain financing from outside lending institutions.  ███████████████████████████
████████████████████████████████  The Term Loan was also subordinated to the

ABL Facility.

215. The Debtors and Remaining Term Lenders' words and conduct, as well as the economic realities of the circumstances surrounding the advances from the Remaining Term Lenders compel the conclusion that those advances were equity contributions disguised as debt.

216. Equity compels the recharacterization of the Alleged Secured Term Loan Claim as equity under the circumstances alleged above.

**COUNT X**

**EQUITABLE SUBORDINATION**
**<u>PURSUANT TO 11 U.S.C. § 510(c)(1)</u>**
(against Term Loan Agent, Reckitt, Quality King, McKesson Ventures, Vagenas, Castle Ridge, Tramunti, Gioia, Mastronardi, JFMW, Webb, Berkowitz, 710 Holdings, Emerson, and Shanklin,)[17]

217. The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

218. Section 510(c) of Bankruptcy Code provides that after notice and a hearing, the bankruptcy court may under the principles of equitable subordination either:

    (a) Subordinate for purposes of distribution all or part of an allowed claim or interest to all or part of another allowed claim or interest; or

    (b) Order that any lien securing such subordinated claim be transferred to the estate.

219. The Alleged Secured Term Loan Claim should be subordinated to the claims of unsecured creditors because the structuring of the Term Loan as "debt" rather than equity was not the product of arms-length negotiations between unrelated parties. Instead, it was calculated by the Remaining Term Lenders to provide themselves an inappropriate advantage and undermine the claims of unsecured creditors in the foreseeable and imminent event of bankruptcy.

---

[17] Pursuant to the Settlement Agreement, the Committee is not asserting this Count against Carlyle, nor is it seeking to equitably subordinate the Allowed Carlyle Claim.

220. 

221.

222.

223.

224. The Remaining Term Loan Claim should be equitably subordinated to the claims of the Debtors' general unsecured creditors pursuant to section 510(c) of the Bankruptcy Code.

## COUNT XI

### AVOIDANCE OF ONE YEAR TRANSFERS
### PURSUANT TO 11 U.S.C. § 547
(against Quality King, Quality Fragrance, Pro's Choice, Ultra, Reckitt, RB HyHo, Mead Johnson, McKesson Medical, McKesson Minnesota, Sealed Air, APS, and Emerson Healthcare)

225.     The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

226.     As more particularly described herein, during the one-year period before the Petition Date, from August 27, 2021 through August 28, 2022 (the "Preference Period"),[18] the Debtors made the transfers identified on Exhibit A (the "One Year Transfers") to or for the benefit of the parties listed on Exhibit A (together, the "Preference Defendants") in an aggregate amount not less than $70,622,649.36.

227.     Each of the Preference Defendants is an "insider" (as that term is defined in the Bankruptcy Code).  As recited in more detail, *supra*, each of the Preference Defendants (i) was represented on the Debtors' Board, (ii) was a corporate affiliate of, and/or had a familial relationship with a person or entity represented on the Debtors' Board; and/or (iii) directly or indirectly owned a controlling and/or preferred equity stake in the Debtors.   In addition, the Preference Defendants each maintained and benefitted from a close relationship with the Debtors at less than arm's length.

228.     Based on reasonable due diligence in the circumstances of these Chapter 11 Cases, and taking into account the Preference Defendants' known or reasonably knowable affirmative defenses under 11 U.S.C. § 547(c), the One Year Transfers constitute avoidable preferential transfers pursuant to 11 U.S.C. § 547.  In arriving at this determination, the Committee, by and through its professionals, conducted an extensive analysis of the Debtors' payment and invoice records, the relationships between the Debtors and each Preference Defendant, and the transactions between the Debtors and each Preference Defendant both during and prior to the Preference Period.

---

[18]     Because August 28, 2021 was a Saturday, the Preference Period includes Friday, August 27, 2021.

229.     Each of the One Year Transfers constituted a transfer of an interest in property of the Debtors.  The One Year Transfers were paid from bank accounts belonging to the Debtors.

230.     Each of the Preference Defendants was a vendor and/or supplier to the Debtors and a creditor at the time of each One Year Transfer by virtue of supplying goods and/or services to or for the benefit of the Debtors, as more fully described in Exhibit A, for which the Debtors were obligated to pay.

231.     Each of the One Year Transfers was made for, or on account of, an antecedent debt or debts owed by the Debtors to one of the Preference Defendants before such One Year Transfers were made.  Each such debt constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code) of the Preference Defendants prior to being paid by the Debtors, as set forth in more detail in Exhibit A.

232.     Each One Year Transfer was to or for the benefit of a Preference Defendant within the meaning of 11 U.S.C. § 547(b)(1), because each such One Year Transfer either reduced or fully satisfied a debt or debts then owed by the Debtors to such Preference Defendant.  The details of each One Year Transfer are set forth in Exhibit A, and include "Invoice Number", "Invoice Date", and "Invoice Amount."[19]

233.     Each of the One Year Transfers was made during the Preference Period.

234.     Each of the One Year Transfers was made while the Debtors were insolvent. The Debtors were in severe financial distress and showed no prospects of financial viability during the entirety of the Preference Period.  The Debtors' liabilities exceeded their assets, they could not

---

[19]     Due to the voluminous number of invoices paid to McKesson (the "McKesson Invoices") during the one-year period, Exhibit A summarizes the McKesson Invoices by date of invoice.  More detailed information regarding the McKesson Invoices, including invoice numbers and amounts, will be provided to McKesson and any other interested party upon request.

pay their debts as they came due and routinely required outside funding to stay afloat. During the Preference Period, any existing liquidity evaporated, resulting in the filing of the Chapter 11 Cases.

235. As a result of each of the One Year Transfers, the Preference Defendants received more than they would have received if: (a) the Chapter 11 Cases were cases under chapter 7 of the Bankruptcy Code; (b) the One Year Transfers had not been made; and (c) the Preference Defendants received payments of their debts under the provisions of the Bankruptcy Code. As evidenced by the proofs of claim that have been received to date, the claims included on the Debtors' bankruptcy schedules, and the sale process, in addition to the Debtors' significant financial distress throughout the Preference Period, the Debtors' liabilities exceeded their assets to the point that holders of general unsecured claims are not expected to receive payment in full on account of their respective allowed claims from the Debtors' bankruptcy estates.

236. Based on the foregoing, the One Year Transfers are avoidable pursuant to 11 U.S.C. § 547(b).

## COUNT XII

### AVOIDANCE OF ONE YEAR TRANSFERS
### PURSUANT TO 11 U.S.C. § 548(a)(1)(A)
(against Quality King, Quality Fragrance, Pro's Choice, Ultra, Reckitt, RB HyHo, Mead Johnson, McKesson Medical, McKesson Minnesota, Sealed Air, APS, and Emerson Healthcare)

237. The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

238. To the extent that one or more of the One Year Transfers are not avoidable under 11 U.S.C. § 547, the Committee asserts such transfers are subject to avoidance as intentional fraudulent transfers of the Debtors to or for the benefit of the Preference Defendants.

239. The One Year Transfers were made within two years of the Petition Date. The One Year Transfers were made with actual intent to favor the Preference Defendants and with

actual intent to hinder, delay or defraud other current and future creditors of the Debtors. The Preference Defendants were or were affiliated with entities that were represented on the Board and/or possessed both debt and equity positions. As a result, the Preference Defendants were well aware of Holdings' reckless spending spree, untenable liquidity position, and inability to timely pay vendors and suppliers.

240. Despite this knowledge, the Preference Defendants caused the Debtors to prioritize payments to the Preference Defendants. The Preference Defendants used their leverage as Managers (members of the Board) and equity and purported debtholders to demand payments and terms from the Debtors that harmed the Debtors and current and future creditors. The Preference Defendants acted intentionally to divert funds from the Debtors and the Debtors' creditors and into their own pockets.

241. Based upon the foregoing, the One Year Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(A).

## COUNT XIII

### AVOIDANCE OF ONE YEAR TRANSFERS
### PURSUANT TO 11 U.S.C. § 548(A)(1)(B)
(against Quality King, Quality Fragrance, Pro's Choice, Ultra, Reckitt, RB HyHo, Mead Johnson, McKesson Medical, McKesson Minnesota, Sealed Air, APS, and Emerson Healthcare)

242. The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

243. To the extent one or more of the One Year Transfers identified on Exhibit A are not avoidable under 11 U.S.Ç. § 547 because such One Year Transfers were not made on account of an antecedent debt or were made in satisfaction of a debt not owed by the Debtors, the Committee asserts that the Debtors did not receive reasonably equivalent value in exchange for such One Year Transfers (the "Potentially Fraudulent Transfers"), including because such One

Year Transfers were made on account of the Preference Defendants' provision of goods and/or services that were faulty or substandard; and that (a) the Debtors were insolvent as of the date of the Potentially Fraudulent Transfer, or became insolvent as a result thereof, (b) the Debtors were engaged, or about to engage, in business or a transaction for which any property remaining with the Debtors was an unreasonably small capital, and/or (c) the Debtors intended to incur, or believed they would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

244. Based upon the foregoing, the Potentially Fraudulent Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(B).

## COUNT XIV

AVOIDANCE OF ███████████████ PURSUANT TO 11 U.S.C. § 548(A)(1)(A)
(against Quality King, Castle Ridge, Milend, Berkowitz, Webb and PPJDM)

245. The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

246. ████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████

247. ████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

248. Based upon the foregoing, the ██████████████ are avoidable pursuant to 11 U.S.C. §§ 544 and 548(a)(1)(A).

## COUNT XV

### AVOIDANCE OF ████████████
### PURSUANT TO 11 U.S.C. § 548(A)(1)(B)
(against Quality King, Castle Ridge, Milend, Berkowitz, Webb and PPJDM)

249. The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

250. ████████████████████████████

████████████ the Committee pleads, in the alternative, that the transferring Debtor(s) did not receive reasonably equivalent value in exchange for such transfers and (a) was insolvent or became insolvent as a result of the payments, (b) was engaged in business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital, and/or (c) intended to incur, or believed it would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

251. ████████████████████████████

252. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

253. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

254. Based upon the foregoing, ▮▮▮▮▮▮▮▮▮▮ are avoidable pursuant to 11 U.S.C. §§ 544 and 548(a)(1)(B).

## COUNT XVI

### RECOVERY OF AVOIDED TRANSFERS
### PURSUANT TO 11 U.S.C. § 550
(against Quality King, Quality Fragrance, Pro's Choice, Ultra, Reckitt, RB HyHo, Mead Johnson, McKesson Medical, McKesson Minnesota, Sealed Air, APS, Emerson Healthcare, Castle Ridge, Milend, Berkowitz, Webb and PPJDM)

255. The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

256. The Committee is entitled to avoid the One Year Transfers pursuant to 11 U.S.C. § 547(b), and/or the Potentially Fraudulent Transfers and the ▮▮▮▮▮▮▮▮ pursuant to 11 U.S.C. § 548 (collectively, the "Avoidable Transfers").

257. The recipients of the Avoidable Transfers (together, the "Transferees") were the initial transferees of the Avoidable Transfer(s), or the entities for whose benefit the Avoidable Transfer(s) were made, or the immediate or mediate transferees of such initial transferee.

258. Pursuant to 11 U.S.C. § 550(a), the Committee is entitled to recover from the Transferees the Avoidable Transfer(s), plus (a) pre- and post-judgment interest thereon from the date of demand to the date of payment or other satisfaction of such order and judgment and (b) the costs of this action.

## COUNT XVII
## DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(d)
(against Term Loan Agent, Vagenas, Tramunti, Mastronardi, Berkowitz, Quality King, Reckitt, Mead Johnson, RB HyHo, McKesson Medical, McKesson Minnesota, Quality Fragrance, Pro's Choice, Ultra, Sealed Air, APS, Emerson Healthcare, Castle Ridge, Milend, Webb and PPJDM)

259. The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

260. The Transferees are transferees of transfers avoidable under sections 544, 547 and/or 548 of the Bankruptcy Code, and/or recoverable under section 550 of the Bankruptcy Code.

261. The Transferees have not paid the amount of the Avoidable Transfer(s), or turned over such property, for which they are liable under 11 U.S.C. § 550.

262. Pursuant to 11 U.S.C. § 502(d), any and all claims of the Transferees, including their claims with respect to the Term Loans, must be disallowed until such time as the Transferees pay to the Debtors an amount equal to the aggregate amount of the Avoidable Transfer(s), plus interest thereon and costs.

263. Pursuant to 11 U.S.C. § 502(j), any and all claims of the Transferees and

the Term Loan Agent, and/or their respective assignees previously scheduled by the Debtors or filed in the Chapter 11 Cases must be disallowed until such time as the Transferees pay to the Debtors an amount equal to the aggregate amount of the Avoidable Transfer(s).

## COUNT XVIII
### BREACH OF CONTRACT (OPERATING AGREEMENTS)
(against Berkowitz, Emerson, Castle Ridge, Milend, Webb, PPJDM, Quality King Distributors, Inc., RB Health (US) LLC, McKesson Ventures, LLC, and Sealed Air Corporation (US) Systems)

264.    The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

265.    The provisions of the Debtors' operating agreements referenced in this Complaint have been substantially similar since 2018. The language cited herein is from The Packable Holdings, LLC Amended and Restated Limited Liability Company Agreement dated April 14, 2022. The same language is contained in the Debtors' operating agreements from 2018 through the Petition Date (collectively, the "Operating Agreements").

266.    Berkowitz, Emerson, Castle Ridge, Milend, Webb, PPJDM, Quality King Distributors, Inc., RB Health (US) LLC, McKesson Ventures, LLC, and Sealed Air Corporation (US) Systems (collectively, the "Contract Defendants") are all Members and are all parties to the Operating Agreements.

267.    At all relevant times, since 2018, the Operating Agreements were valid and enforceable contracts.

268.    The Operating Agreements impose confidentiality requirements on each Member and Manager of the Debtors, which state, in pertinent part:

> Each Member and Manager agrees that such Member and Manager, as applicable, will keep confidential and will not disclose, divulge, or use for any purpose (other than to monitor its investment in the

> Company) any confidential information obtained from the Company
> pursuant to the terms of this Agreement or otherwise.

Operating Agreements at § 13.6.

269. The Operating Agreements further limit Member access to competitively sensitive information, stating:

> Notwithstanding anything in this Agreement to the contrary, no
> Member (other than Carlyle) shall be entitled to receive any
> Competitively Sensitive Information.

Operating Agreements at § 15.6.

270. The Operating Agreements acknowledge that certain of the Debtors' Members may compete with the Debtors' businesses, but such competition does not:

> relieve (1) any Member from liability associated with the
> unauthorized use or disclosure of the Company's confidential
> information obtained pursuant to [the Operating] Agreement or (2)
> any Manager or Officer from any liability associated with his or her
> duties and obligations (including his or her fiduciary duties) to the
> Company, including any obligations as a Covered Person.

Operating Agreements at § Section 6.1(i)(iii).

271. Section 6.1(i)(ii) of the Operating Agreements continues by imposing liability on members with outside business interests for exploiting opportunities "that the Company can demonstrate came into the possession of a Covered Person exclusively as a result of such Covered Person acting in his or her official capacity as a member of the Board." Operating Agreements at 6.1(i)(ii).

272. The Operating Agreements define Covered Persons as RB Health (US) LLC or its Affiliates, McKesson Ventures LLC or its Affiliates, Sealed Air Corporation (US) or its Affiliates, Carlyle Partners VII Pacer Holdings, L.P., together with any affiliated investment funds and investment vehicles, or Quality King Distributors, Inc., and its Affiliates. Operating Agreements at §§ 1.1(kk) *citing* Operating Agreements at 6.1(i)(ii).

273.     Board meeting minutes from March 4, 2022 explain that "the Company had approximately $42 million of overdue payables, many vendors were holding orders, and the Company had fallen into arrears with respect to its required payments to a number of vendors." "[V]endors were shipping 30%-40% fill rate over [the] past few months and . . . it would be possible to stretch payables out beyond May and that, until then, the Company would be selectively paying certain payables and partners."

274.     In the year prior to the Petition Date, the Debtors' insider vendors, which include RB Health, McKesson, Sealed Air, and Quality King, received more than $70 million in payments.  The Debtors' other vendors did not fare as well.

275.     By early March 2022, through their actions, it is apparent that the Contract Defendants were in a panic to protect their own financial interests.  The above cited provisions in the Operating Agreements require the proper use of confidential and/or competitively sensitive information and prohibit the exploitation of business opportunities.  Despite these provisions, the Contract Defendants (who ran and /or controlled the insider vendors) utilized their position as Managers with access to confidential and competitively sensitive information to favor themselves, their instrumentalities, and/or companies for which they acted as agents (and the affiliates of all the foregoing) over other unsecured creditors.  These Managers, (either directly or through an agent and/or appointee), favored themselves in various ways, including procuring from the Debtors "memorandums of understanding" providing for significant catch-up payments, converting unsecured trade payables to secured debt, assuring priority in payment over other unsecured creditors, and obtaining broad releases from the Debtors, all mechanisms not provided to non-insider creditors and companies.

276.     The Contract Defendants had their instrumentalities and entities (the insider

vendors), on whose behalf they were acting as agent, cut off inventory to the Debtors upon learning of the Debtors dire financial straits—in contravention of sections 13.6 and 15.6 of the Operating Agreements. Quality King notified Holdings that orders would not be released until past-due invoices were paid and, upon information and belief, the Quality King Entities placed at least three liens against Holdings' assets.

277. The Contract Defendants leveraged the much-needed inventory from their vending companies, to demand onerous, non-market terms and benefits from the Debtors, which only served to benefit the insider vendors and harm the company and other stakeholders.

278. Quality King, Reckitt, McKesson Ventures, Sealed Air, and Mr. Emerson used their insider leverage to convert their pre-term loan unsecured receivables into secured debt. The Contract Defendants used the Debtors to subsidize their own businesses.

279. Quality King, Emerson, McKesson Minnesota, and Sealed Air required Holdings to enter into "updated trade terms" more favorable to the Contract Defendants and their vending companies—extracting inappropriate payment requirements related to old trade debt that significantly favored the insider vendors over other non-insider trade vendors.

280. Quality King pressured the Debtors to agree to pay Quality King $5 million on account of outstanding invoices within 4 weeks and the full outstanding balance within 180 days.

281. McKesson Minnesota required payment of $3 million from the Debtors by September 30, 2022.

282. In April 2022, the Board amended the LLC Agreement to provide Reckitt with even greater influence, including: (a) giving Reckitt the right to an additional Board seat; (b) requiring the consent of the Reckitt Managers to hire or terminate an officer; (c) requiring the consent of the Reckitt Managers before changing the business in a manner that was in any way

adverse to Reckitt; and (d) giving Reckitt "enhanced preemptive rights" for the right to purchase 150% of its *pro rata* portion of any new securities issued by the Debtors.

283.     Then, in May 2022, even after the Debtors made the second $2.5 million payment to insider Quality King pursuant to the Quality King MOU, Quality King still refused to supply product.

284.     The Contract Defendants came into confidential information, competitively sensitive information, and opportunities, exclusively in their capacity as members of the Debtors or as Covered Persons.  The Contract Defendants used the information and opportunities to improve the Contract Defendants' financial situation and prospects for themselves and their vending companies, all to the Debtors' detriment.

285.     The Contract Defendants used or disclosed the Debtors' confidential and competitively sensitive information obtained pursuant to the Operating Agreements in breach of the Operating Agreements and to the Debtors' detriment.

286.     The Contract Defendants' breaches of the Operating Agreements have caused the Debtors to sustain substantial economic harm in an amount to be determined.

## COUNT XIX
### BREACH OF FIDUCIARY DUTY OF LOYALTY
### (OPERATING AGREEMENTS SECTION 6.1)
(against Vagenas, Tramunti, Mastronardi, Berkowitz, Quality King, Emerson, the Emerson Entities, Castle Ridge, Milend, Webb, PPJDM, Gioia, JFMW, Quality King Distributors, Inc., Quality King Fragrances, Inc., Olla Beauty Supply, LLC, Pro's Choice Beauty Care, Inc., Deborah International Beauty Ltd., Glenn Nussdorf, RB Health (US) LLC, Reckitt Benckiser LLC, Mead Johnson & Company LC, McKesson Ventures, LLC, McKesson Corporation, McKesson Medical-Surgical Minnesota Supply Inc., Sealed Air Corporation (US), Shanklin Corp., Automated Packaging Systems, Nitish Kapoor, Thomas Rodgers, Arjun Purkayastha, and Carrie Williams)

287.     The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

288.     The Operating Agreements impose upon each Manager a fiduciary duty akin to the duties owed by a member of a board of directors for a corporation.  Specifically, section 6.1 of the Operating Agreements provide:

> each Manager shall owe, and shall act in a manner consistent with, fiduciary duties to the Company and its Members of the nature, and to the same extent, as those owed by directors of a Delaware corporation; provided, that, to the fullest extent permitted by law, . . .each Manager of the Company shall not be *personally* liable to the Company or its members for *monetary* damages for breach of fiduciary duty as a . . . Manager."

Operating Agreements at § 6.1(i)(i) (emphasis added).

289.     Nothing in this Complaint shall be construed as seeking monetary damages against the individual Managers for breaching their fiduciary duty while acting solely in their capacity as Managers.  However, section 6.1(i)(i) specifically <u>does not</u> exculpate any Manager for non-monetary damages and/or equitable relief stemming from a breach of fiduciary duty.   As a result, the Committee is seeking all available non-monetary relief, including without limitation, injunctive and declaratory relief that invalidates and seeks the recission and return of redemption payments and Term Loans, recharacterization of the Term Loans as equity, and rescission of all transfers received by the Managers and/or the Intervening Entities (defined below) in which the Managers are agents.

290.     At all relevant times, since 2018, Vagenas, Tramunti, Mastronardi, Berkowitz, Webb, Nitish Kapoor, Arjun Purkayastha, Thomas Rodgers, Carrie Williams, and Glenn Nussdorf (collectively, the "<u>Human Controllers</u>") each controlled the entities with which they were involved, as set forth in allegations paragraphs 32-50 (collectively, the "<u>Intervening Entities</u>").

291.     As set forth below, the Human Controllers engaged directly and indirectly

in interested transactions with the Debtors and are liable for breach of fiduciary duty. Each Intervening Entity, as a direct or indirect beneficiary of the Human Controllers' breach of fiduciary duty is liable for the damages caused by the Human Controllers' breach of fiduciary duty. Each Human Controller, as a direct or direct beneficiary of the Human Controller's breach of fiduciary duty, is liable for the damages caused by their breach of fiduciary duty.

292. The Intervening Entities are mere instrumentalities of the Human Controllers. As such, the respective Intervening Entity is the alter ego of the Human Controller. Therefore, in addition or in the alternative to holding the Human Controller liable, the entity veil may be pierced to also hold the Intervening Entity liable for the acts of the Human Controller.

293. Upon information and belief, at all times that Nitish Kapoor ("Kapoor"), Charlene Lim ("Lim"), Arjun Purkayastha ("Purkayatha"), or any other person designated by Reckitt as a Manager (collectively with Kapoor, Lim, and Purkayatha, the "Reckitt Agents") served as a Manager of the Debtors, the respective Reckitt Agent was simultaneously employed by, or otherwise affiliated with, one or more of the Reckitt Entities.

294. The Reckitt Agents were designated by one or more Reckitt Entity for appointment to the Debtors' Board of Managers. The actions of the Reckitt Agents, in contravention of their fiduciary duties owed to the Debtors, directly benefited one or more of the Reckitt Entities.

295. Upon information and belief, at all times that Thomas Rodgers ("Rodgers") and/or Carrie Williams ("Williams," and collectively with Rodgers, the "McKesson Agents") served as a Manager of the Debtors, the respective McKesson Agent was simultaneously employed by, or otherwise affiliated with, one or more of the McKesson Entities.

296. The McKesson Agents were designated by one or more McKesson Entity

for appointment to the Debtors' Board of Managers. The actions of the McKesson Agents, in contravention of their fiduciary duties owed to the Debtors, directly benefited one or more of the McKesson Entities.

297. Mr. Nussdorf or a member of his family serves as CEO of each of the Quality King Entities. Mr. Nussdorf has been a member of the Board since 2014. The actions of Mr. Nussdorf, in contravention of the fiduciary duties he owed to the Debtors, directly benefited one or more of the Quality King Entities.

298. The Managers, including the Human Controllers and Intervening Entities, owed the Debtors a duty of loyalty obligating them to act on a disinterested and independent basis, in good faith, to advance the best interests of the Debtors and to refrain from conduct that would injure the Debtors. The fiduciary duty of loyalty prohibited the Managers from utilizing their positions as Managers of the Debtors—either directly, or through their agent, appointee, employee, and/or controlled entity—to advance their own personal interests. Rather, the duty of loyalty required the Managers to not enter into self-interested transactions to the detriment the Debtors.

A.    **The Managers' Self-Interested Transactions**

299. Instead, the Managers engaged in, and authorized, repeated self-interested transactions that were unfair to, and substantially harmed, the Debtors. The Managers repeatedly utilized their positions as Managers to benefit themselves, or entities related to them, and engaged in unfair, self-interested transactions.

300. Section 6.1(i)(ii) of the Operating Agreements imposes liability on members with outside business interests for exploiting opportunities "that the Company can demonstrate

came into the possession of a Covered Person exclusively as a result of such Covered Person acting in his or her official capacity as a member of the Board." Operating Agreements at § 6.1(i)(ii).

301.



| Holder | Number of Units | Cash Contribution | ███████ Amount |
|---|---|---|---|
| Quality King | | | |
| Castle Ridge (Vagenas) | | | |
| Milend (Tramunti) | | | |
| Berkowitz | | | |
| Webb | | | |
| PPJDM LLC (Mastronardi) | | | |

302. These self-interested redemptions and loan repayments consumed over $60 million of Series B proceeds, severely limiting the company's ability to address its long-term capital needs and left the Debtors with an unreasonably small amount of capital. The remaining Series B proceeds were insufficient to fund the West Coast Expansion, address operational issues and mounting losses, and maintain the necessary liquidity to go public.

303. The Redemption Payments, made as a consequence of the Members' breaches of fiduciary duties, should be unwound. The liens and Releases granted in conjunction with the Term Liens should be null and void.

**B.    Use of Confidential Information for Competitive Advantage**

304. The Operating Agreements acknowledge that certain of the Debtors'

Members may compete with the Debtors' businesses, but such competition does not:

> relieve (1) any Member from liability associated with the unauthorized use or disclosure of the Company's confidential information obtained pursuant to [the Operating] Agreement or (2) any Manager or Officer from any liability associated with his or her duties and obligations (including his or her fiduciary duties) to the Company, including any obligations as a Covered Person.

Operating Agreements at § Section 6.1(i)(iii).

305.    As set forth above in paragraph 77-78, the Operating Agreements also impose confidentiality requirements on each Member and Manager of the Debtors. Operating Agreements at § 13.6. The Operating Agreements further limit a Member's access to competitively sensitive information, stating that, "no Member (other than Carlyle) shall be entitled to receive any Competitively Sensitive Information. Operating Agreements at § 15.6.

306.    As set forth above in paragraphs 272 to 283, ████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████

307.    The Managers and the Human Controllers also promoted and approved the following transactions, each of which violated their fiduciary duty of loyalty: (i) utilizing the MGG Loan to repay the QK Loan; (ii) negotiating and authorizing the Redemption Payments; (iii) continuing to pursue an impossibly aggressive expansion of the Debtors' business when the Debtors were not profitable for the sole reason of driving revenue to support a baseless SPAC valuation; (iv) favoring insider vendors over non-insider vendors; (v) providing for insider vendor payments in preference to non-insider vendor payments; (vi) approving the Term Loan Agreement; (vii) approving the Tranche A Roll Up; (viii) negotiating the Releases; and (ix) approving the MOUs.

308. Each of these transactions were self-interested.

309. The Intervening Entities are mere instrumentalities of the Human Controllers. As such, the respective Intervening Entity is the alter ego of the Human Controller. Therefore, in addition or in the alternative to holding the Human Controller liable, the entity veil may be pierced to also hold the Intervening Entity liable for the acts of the Human Controller.

310. The Members, therefore, whether acting through or on behalf of the Members, Human Controllers, or Intervening Entities, breached their fiduciary duties of loyalty by prioritizing their personal financial interests over the Debtors. As a direct result of the Members' breaches of their fiduciary duty of loyalty, the Debtors entered into a series of transactions that harmed the Debtors. The Debtors are entitled to injunctive relief to unwind the harmful, breaching transactions and/or other non-monetary relief to remedy the harm caused by these breaching transactions.

## COUNT XX

### BREACH OF FIDUCIARY DUTIES OF CARE AND LOYALTY (OPERATING AGREEMENTS SECTION 6.2)
(against Vagenas, Tramunti, Mastronardi, Berkowitz, and Webb)

311. The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

312. The Operating Agreements provide, in section 6.2, that the Board of Holdings may designate individuals as officers and provides for the duty owed by such officers. Specifically, section 6.2 states:

> The Board may from time to time designate individuals as officers . . . of the Company, and any such Officers shall have such authority and perform such duties as the Board may from time to time delegate to them and shall serve at the will of the Board. . . .The officers of the Company and its Company Subsidiaries, in the performance of their duties as such, shall owe to the Company and its Company Subsidiaries fiduciary duties (including duties of loyalty and due

> care) of the type owed by an officer or a corporation to such corporation and its stockholders under the laws of the State of Delaware.

Operating Agreements at § 6.2

313.     At all relevant times, since 2018, Vagenas, Tramunti, Mastronardi, Berkowitz, and Webb were Officers (collectively, the "Officers") of the Debtors and each controlled their Intervening Entities as Human Controllers as set forth in paragraphs 32-50.

314.     As set forth below, the Human Controllers engaged directly and indirectly in interested transactions with the Debtors and are liable for breach of fiduciary duty.    Each Intervening Entity, as a direct or indirect beneficiary of the Human Controllers' breach of fiduciary duty, is liable for the damages caused by the Human Controllers' breach of fiduciary duty.    In addition, each Human Controller, as a direct or direct beneficiary of their own breach of fiduciary duty, is liable for the damages caused by their breach of fiduciary duty.

315.     The Intervening Entities are mere instrumentalities of the Human Controllers.    As such, the respective Intervening Entity is the alter ego of the Human Controller. Therefore, in addition or in the alternative to holding the Human Controller liable, the entity veil may be pierced to also hold the Intervening Entity liable for the acts of the Human Controller.

316.     The Officers served in a fiduciary capacity with respect to the Debtors, including when the Debtors were insolvent or possessed unreasonably small capital.

317.     As fiduciaries, the Officers owed the Debtors a duty of care, with respect to their interactions and management of the Debtors, to act in an informed, deliberate, and rational

manner, and in doing so exercise the degree of care an ordinary prudent person would exercise under similar circumstances.

318.    The Officers also owed the Debtors a duty of loyalty obligating them to act on a disinterested and independent basis, in good faith, to advance the best interests of the Debtors and to refrain from conduct that would injure the Debtors. The fiduciary duty of loyalty prohibited the Officers from utilizing their positions as Managers of the Debtors—either directly, or through their Intervening Entity—to advance their own personal interests. As such, the duty of loyalty required the Fiduciaries to not enter into self-interested transactions to the detriment of the Debtors.

319.    Despite their duty, the Officers managed the Debtors with an eye toward getting the highest return on their investments for themselves and maximizing the income of their Intervening Entities to the detriment of the Debtors.

A.    **The Redemption Payments**

320.    In November 2020, the Officers participated directly or indirectly through an Intervening Entity in the Redemption Payments, which were executed by Vagenas, to redeem units from existing members, for approximately $60 million, at grossly inflated amounts. The Officers, either directly or through their Intervening Entities, received Redemption Payments as more fully set forth above. In approving their own Redemption Payments, each Officer breached that Officer's respective fiduciary duty of loyalty by engaging in a self-dealing transaction to the Debtors' detriment.

321.    In approving and facilitating Redemption Payments to other Officers, each Officer breached that Officer's respective fiduciary duty of care by failing to act in a fully informed and rational manner, and failing to exercise the degree of care an ordinary prudent person would exercise under similar circumstances.

322.     No reasonable person acting as an officer of the Debtors at the time of the redemption payment would believe that the use of approximately $60 million in proceeds to redeem stock was an appropriate use of the Series B proceeds. The unreasonableness of these redemption transactions is only magnified in light of the other loan repayments and major transactions (as described above) that combined to squander nearly $130 million of the Debtors Series B proceeds by transferring those funds to interested Officers, interested Manager, Human Controllers, and the Intervening Entities.

323.     These transactions severely limited the Debtors' ability to address their long-term capital needs and left the Debtors with unreasonably small capital. The remaining capital after the Redemption Payments and loan repayments was insufficient to fund necessary expansion, address operational issues and mounting losses, and maintain liquidity to go public.

324.     Under the Officers' supervision, Holdings' inventory stock ballooned from $51 million to $108 million, with net product cost soaring from $136 million to over $206 million. Not surprisingly given the insider dealings, $91 million of such product costs were sent to insider suppliers. In 2020, Holdings paid approximately $8.2 million in interest and fees related to the repayment of related party loans and $1.1 million in rent to Quality King for its Ronkonkoma, NY warehouse facility.

325.     In May 2021, Holdings' Audited Consolidated Financial Statements for December 31, 2020, indicated Holdings had sufficient working capital to fund operations for the foreseeable future. However, the October 2021 financial statements provided that to date, Holdings had not generated sufficient liquidity to fund operations. Deloitte now stated that the Holdings' negative cash flows resulted in it being unable to remain in compliance with covenant requirements under the ABL Facility. Holdings acknowledged substantial doubt about its ability to continue as

a going concern.

326. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

B.   **The SPAC Merger and Inflated Valuation**

327.    On June 20, 2021, the Debtors and the Highland SPAC entered into a letter of intent for a proposed business combination. As a SPAC, Highland's purpose was to merge with a target, such as Holdings, that could not withstand the SEC scrutiny to go public on its own.

328.    On September 9, 2021, the Debtors and Highland entered into the Merger Agreement to take the merged company public. The newly formed public company was projected to have an unsupportable enterprise value of $1.55 billion and an equity value of $1.9 billion. Based on this valuation, existing equity holders were expected to receive 70.5% of the new equity and the insider-Defendants were slated to receive their respective percentages of $1.346 billion in equity value if the SPAC merger closed.

329.    However, since Holdings utilized a significant portion of the Carlyle investment on equity redemptions and debt repayment, Holdings lacked sufficient liquidity to fund necessary capital improvements. Simultaneously with executing the Merger Agreement, and in order to fund operations until the merger was complete, Holdings issued the $110 million Notes. The liquidity from the Notes, however, was only enough to keep Holdings afloat until the merger closed.

330.     Despite its lack of sustainable funding, Holdings continued pursuing an aggressive growth strategy to drive sales to justify the inflated SPAC valuation that was not supported by Holdings' operational and financial performance.   Holdings further expanded its workforce to 1,300 employees and launched a rebranding campaign, adding to an already unsustainable cost structure.   On or around 2021, Holdings finally sought to implement an inventory tracking system.   Holdings, however, experienced technical difficulties implementing the system, which further contributed to losses in 2021.   For the first nine months of 2021 leading up to the Merger Agreement, Holdings sustained a net loss of $102.2 million.   While Holdings had raised $110 million from the Notes in September, by December 2021, net losses grew to $175 million.

## C.     Extreme Mismanagement and Lack of Internal Controls

331.     As referenced above, the officers exhibit a general lack of internal controls and extreme mismanagement in managing the daily affairs of the Debtors.   Carlyle reassessed its investment in Holdings and the proper path forward in April 2022.   Upon review, Carlyle acknowledged that Holdings had been "extremely mismanaged," suffered from a "lack of internal controls" and, while the situation may be salvageable, Holdings would require another $250 million of capital to stabilize and generate a return on Carlyle's investment.

332.     The abject lack of internal controls, coupled with the self-dealing motives of the Officers and Managers, created a fait accompli whereby the Debtors could not sustain their operations and would be forced into liquidation.

333.     The Officers knew, or should have known, that their spending was unsustainable and would lead to economic ruin if the SPAC transaction failed to close.   Deloitte's audited consolidated financial statements for Holdings as of December 31, 2021 included new

liquidity warnings. Deloitte now stated that the Holdings' negative cash flows resulted in it being unable to remain in compliance with covenant requirements under the ABL Facility. Holdings acknowledged substantial doubt about its ability to continue as a going concern.

334. By May 2022, Reckitt was expressing frustration with stranded inventory and that such "inconsistencies [were] not driving confidence that Packable has a tight grip on execution." The Board acknowledged that the reason Holdings continued to "burn[] so much cash" was gross mismanagement: they were "so focused on growth and anxious in light of the out-of-stocks that [they] were often taking what [they] could get and not thinking through the unit economics associated with each individual SKU."

335. In June 2022, the Debtors were forced into a liquidation process months before the Petition Date, as they burned through inventory with no ability to restock it. By July 2022, only 3 months after the Tranche A funding, Holdings was out of money. On July 21, 2022, the Term Lenders and Daniel Myers, through 5E Consulting LLC, provided the $8.7 million Bridge Loan to allow Holdings time to evaluate options. The Bridge Loan contained a sweeping release for all conduct following entry into the Term Loan and included Mr. Myers as a released party in the Bridge Loan Release.

336. Carlyle's investment committee acknowledged Holdings' extreme volatility. While Carlyle had expected its $260 million investment would provide Holdings sufficient liquidity to maintain operations until a near-to medium-term IPO, Holdings' extreme mismanagement contributed to an untenable liquidity crunch, especially given the redemption payments.

337. ████████████████████████████████████
████████████████████████████████████████████

338.

339.

340.

341.

342.     As a direct result of the Officers' breach of their fiduciary duty of care, including their grossly negligent management of the Debtors, whether directly, or through Intervening Entities, the Debtors have sustained substantial economic harm in an amount to be determined.

## COUNT XXI

### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
(against Berkowitz, Emerson, Castle Ridge, Milend, Webb, PPJDM, Quality King Distributors, Inc., RB Health (US) LLC, McKesson Ventures, LLC, and Sealed Air Corporation (US) Systems)

343.     The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

344.     The provisions of the Debtors' operating agreements referenced in this Complaint have been substantially similar since 2018.  The language cited herein is from The Packable Holdings, LLC Amended and Restated Limited Liability Company Agreement dated April 14, 2022.  The same language is contained in the Debtors' operating agreements from 2018 through the Petition Date (collectively, the "Operating Agreements").

345.     At all relevant times, since 2018, the Operating Agreements were valid and enforceable contracts.

346.     The Contract Defendants (Berkowitz, Emerson, Castle Ridge, Milend, Webb, PPJDM, Quality King Distributors, Inc., RB Health (US) LLC, McKesson Ventures, LLC, and Sealed Air Corporation (US) Systems) are all Members and are all parties to the Operating Agreements.

347.     The Operating Agreements require the Contract Defendants to act on a disinterested and independent basis, in good faith, to advance the best interests of the Debtors and

to refrain from conduct that would injure the Debtors.

348. The Operating Agreements, however, were incapable of expressly prohibiting all actions by Members, Officers, and Managers that would harm the Debtors.

349. For this reason, an implied covenant is read into every Operating Agreement that requires the Members to act in good faith and with fair dealings toward the Debtors.

350. This implied covenant has not, and cannot, be waived, and parties may not receive an exculpation for violating the implied covenant of good faith and fair dealing.

351. As set forth above, the Members systematically sacrificed the Debtors to benefit the Members personally, or to benefit the Intervening Entities and affiliates of the Intervening Entities' operations. The Members oversaw the Debtors' operations with a myopic focus on maximizing revenue without any regard for profitability and long-term viability.

352. The Members recklessly pursued a strategy of growth at all costs to justify an inflated SPAC valuation that would directly benefit the Members to the detriment of the Debtors.

353. ██████████████████████████████████████████
████████████████████████████████████████████████
█████████████

354. ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

355. ███████████████████████████████████

356. ████████████████████████████████████████████████

**COUNT XXII**

**UNJUST ENRICHMENT (REDEMPTION AND TERM LOAN PAYMENTS)**
(against Reckitt, Quality King, McKesson Ventures, Castle Ridge, Gioia, JFMW, Mr. Webb, 710 Holdings, Mr. Emerson, Shanklin, Milend, Berkowitz, and PPJDM)

357.     The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

358.     Reckitt, Quality King, McKesson Ventures, Castle Ridge, Gioia, JFMW, Mr. Webb, 710 Holdings, Mr. Emerson, Shanklin, Milend, Berkowitz, and PPJDM were unjustly enriched through the actions of their respective Human Controller, who were all Officers and/or Managers, engaging in unjustified and self-interested acts through their management or direction of the Debtors. All of the foregoing parties who were unjustly enriched received their benefit through the breach of fiduciary duty of a Manager and/or Officer.

359.     This mismanagement includes the payment of the Redemption Payments and/or approving the Term Loan Agreements.

360.     To the extent the Redemption Payments and the Term Loans are not otherwise avoidable, the Committee pleads, in the alternative, that the recipients of the Redemption Payments received oversized returns (up to 9,000%) on their original minimal investments in Holdings. The recipients of the Redemption Payments, who also authorized their payment as

members of the Board, were fully aware of the tenuous financial condition of the Debtors at the time of the Redemption Payments. While Holdings received $260 million from the issuance of the Series B Units to Carlyle, Holdings utilized approximately $60 million in the form of the Redemption Payments and approximately $70 million in other redemptions and loan repayments, leaving the Debtors with only $81.7 million at the end of December 2020. This amount was unreasonably small in light of the Debtors' capital demands.

361. The recipients of the Redemption Payments knew, as a result of their positions as equity holders and members of the Board, that the Debtors were not profitable, had significant operational deficiencies, were pursuing an expensive expansion of the business that required a substantial capital investment, and would be incurring substantial go-forward obligations. The recipients of the Redemption Payments further knew that the success of the Debtors' business hinged upon a future SPAC transaction to raise additional capital.

362. The issuance of the Term Loans was done with an eye toward extracting a release from the Debtors at a time when misconduct was known by the Officers who are the ultimate Human Controllers of the recipients and/or otherwise related to the recipients.

363. As a result, the recipients of the Redemption Payments and the issuers of the Term Loans knew that the Debtors (a) were insolvent or would be rendered insolvent as a result of the Redemption Payments; (b) were engaged in a business for which the Debtors' remaining property constituted unreasonably small capital; and (c) intended to incur, or believed it would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

364. Based upon the foregoing, the redemption transaction should be unwound, and the Redemption Payments should be returned to the Debtors for the benefit of the Debtors' estates. The Releases and liens granted through the Term Loans should be invalidated if there is

otherwise no adequate remedy at law.

## COUNT XXIII

### UNJUST ENRICHMENT (THROUGH BREACH OF CONTRACT)

(against Vagenas, Tramunti, Mastronardi, Quality King, the Emerson Entities, Quality King Distributors, Inc., Quality King Fragrances, Inc., Olla Beauty Supply, LLC, Pro's Choice Beauty Care, Inc., Deborah International Beauty Ltd., Glenn Nussdorf, RB Health (US) LLC, Reckitt Benckiser LLC, Mead Johnson & Company LC, McKesson Ventures, LLC, McKesson Corporation, McKesson Medical-Surgical Minnesota Supply Inc., Sealed Air Corporation (US), Shanklin Corp., and Automated Packaging Systems)

365. The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

366. Vagenas, Tramunti, Mastronardi, Quality King, the Emerson Entities, Quality King Distributors, Inc., Quality King Fragrances, Inc., Olla Beauty Supply, LLC, Pro's Choice Beauty Care, Inc., Deborah International Beauty Ltd., Glenn Nussdorf, RB Health (US) LLC, Reckitt Benckiser LLC, Mead Johnson & Company LC, McKesson Ventures, LLC, McKesson Corporation, McKesson Medical-Surgical Minnesota Supply Inc., Sealed Air Corporation (US), Shanklin Corp., and Automated Packaging Systems (collectively, the "Enriched Defendants") were unjustly enriched by the breaches of contract of their respective Human Controller, Affiliates, and/or Covered Persons engaging in unjustified and self-interested acts through their management or direction of the Debtors.

367. This mismanagement includes improperly using confidential information to execute on a series of transactions that allowed the Enriched Defendants to limit their credit exposure, receive payments and enhance rights against the Debtors—including secured claims— and tighten credit terms, all to the Debtors' detriment.

368. During this time, Contract Defendants utilized their positions as Managers and Members (either directly, or through an agent and/or appointee) with access to confidential and competitively sensitive information to favor themselves and their affiliates over other unsecured

creditors, including by procuring from the Debtors "memorandums of understanding" providing for significant catch-up payments, converting unsecured trade payables to secured debt, assuring priority in payment over other unsecured creditors, and obtaining broad releases from the Debtors.

369. The Enriched Defendants used the afore-mentioned information and opportunities to improve their financial situation and prospects to the Debtors' detriment.

370. All transactions stemming from the Enriched Defendants improper obtainment or use of confidential information, competitively sensitive information, and opportunities should be rescinded, and all improperly obtained benefits should be disgorged if there is no adequate remedy at law.

## COUNT XXIV
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
(against Term Loan Agent, , Quality King, Emerson, the Emerson Entities, Castle Ridge, Milend, PPJDM, Quality King Distributors, Inc., Quality King Fragrances, Inc., Olla Beauty Supply, LLC, Pro's Choice Beauty Care, Inc., Deborah International Beauty Ltd., Glenn Nussdorf, RB Health (US) LLC, Reckitt Benckiser LLC, Mead Johnson & Company LC, McKesson Ventures, LLC, McKesson Corporation, McKesson Medical-Surgical Minnesota Supply Inc., Sealed Air Corporation (US), Shanklin Corp., and Automated Packaging Systems)

371. The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

372. Each of the Fiduciaries, Contract Defendants, and Intervening Entities knowingly participated in the other Fiduciaries', Officers', Contract Defendants', Intervening Entities', and Human Controllers' breaches of fiduciary duty.

373. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

85

374. As a consequence of each of the Fiduciaries', Officers', Contract Defendants', Intervening Entities', and Human Controllers' actions, the Debtors have sustained substantial economic harm in an amount to be determined.

## COUNT XXV
### AIDING AND ABETTING BREACH OF CONTRACT (OPERATING AGREEMENTS)
(against Term Loan Agent, Vagenas, Tramunti, Mastronardi, Quality King, the Emerson Entities, Quality King Fragrances, Inc., Olla Beauty Supply, LLC, Pro's Choice Beauty Care, Inc., Deborah International Beauty Ltd., Glenn Nussdorf, Reckitt Benckiser LLC, Mead Johnson & Company LC, McKesson Corporation, McKesson Medical-Surgical Minnesota Supply Inc., Shanklin Corp., Automated Packaging Systems, Nitish Kapoor, Thomas Rodgers, Arjun Purkayastha, and Carrie Williams)

375. The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

376. Each of the Fiduciaries, Officers, Contract Defendants, Intervening Entities, and Human Controllers knowingly participated in the other Fiduciaries', Officers', Contract Defendants', Intervening Entities', and Human Controllers' breaches of contract.

377. In the event that the following entities are not single member entities (who would be directly liable), and to the extent the Fiduciaries, Contract Defendants, Intervening Entities, and Human Controllers are not liable for breaches of contract directly, the Fiduciaries, Contract Defendants, Intervening Entities, and Human Controllers acted in concert to promote and approve the following transactions: (i) utilizing the MGG Loan to repay the QK Loan; (ii)

authorizing or supporting the Redemption Payments; (iii) continuing to pursue an impossibly aggressive expansion of the Debtors' business when the Debtors were not profitable for the sole reason of driving revenue to support a baseless SPAC valuation; (iv) favoring insider vendors over non-insider vendors; (v) providing for insider vendor payments in preference to non-insider vendor payments; (vi) approving the Term Loan agreement; (vii) approving the Tranche A Roll Up; (viii) negotiating the Releases; and (ix) approving the MOUs.

378.    As a consequence of each of the Fiduciaries', Contract Defendants', Intervening Entities', and Human Controllers' actions, the Debtors have sustained substantial economic harm in an amount to be determined.

## COUNT XXVI
### TORTIOUS INTERFERENCE WITH CONTRACT (OPERATING AGREEMENTS)
(against Term Loan Agent, Vagenas, Tramunti, Mastronardi, Quality King, the Emerson Entities, Quality King Fragrances, Inc., Olla Beauty Supply, LLC, Pro's Choice Beauty Care, Inc., Deborah International Beauty Ltd., Glenn Nussdorf, Reckitt Benckiser LLC, Mead Johnson & Company LC, McKesson Corporation, McKesson Medical-Surgical Minnesota Supply Inc., Shanklin Corp., Automated Packaging Systems, Nitish Kapoor, Thomas Rodgers, Arjun Purkayastha, and Carrie Williams)

379.    The Committee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

380.    Each of the Fiduciaries, Officers, Contract Defendants, Intervening Entities, and Human Controllers knew of the existence of and knowingly and intentionally participated in, the other Fiduciaries', Officers', Contract Defendants', Intervening Entities', and Human Controllers' breaches of contract.

381.    Each of the Fiduciaries, Officers, Contract Defendants, Intervening Entities, and Human Controllers engaged, without justification, in conduct that was a significant factor in the other Fiduciaries', Officers', Contract Defendants', Intervening Entities', and Human Controllers' breaches of contract.

382.    In the event that the following entities are not single member entities (who would be directly liable), and to the extent the Fiduciaries, Contract Defendants, Intervening Entities, and Human Controllers are not liable for breaches of contract directly, the Fiduciaries, Contract Defendants, Intervening Entities, and Human Controllers acted to promote and approve the following transactions: (i) utilizing the MGG Loan to repay the QK Loan; (ii) authorizing or supporting the Redemption Payments; (iii) continuing to pursue an impossibly aggressive expansion of the Debtors' business when the Debtors were not profitable for the sole reason of driving revenue to support a baseless SPAC valuation; (iv) favoring insider vendors over non-insider vendors; (v) providing for insider vendor payments in preference to non-insider vendor payments; (vi) approving the Term Loan agreement; (vii) approving the Tranche A Roll Up; (viii) negotiating the Releases; and (ix) approving the MOUs.

383.    As a consequence of each of the Fiduciaries', Contract Defendants', Intervening Entities', and Human Controllers' actions, the Debtors have sustained substantial economic harm in an amount to be determined.

## PRAYER FOR RELIEF

WHEREFORE, the Committee requests that this Court grant the following relief:

A.  On Count I, declaratory judgment in favor of the Committee and against the Term Loan Agent, under section 506 of the Bankruptcy Code and Bankruptcy Rules 7001(2) and (9), that Prepetition Liens do not attach to the Leasehold Interests and any proceeds thereof;

B.  On Count II, judgment in favor of the Committee and against the Term Loan Agent, under section 544(b) of the Bankruptcy Code, avoiding as unperfected the Prepetition Liens against the Debtors' Leasehold Interests and any proceeds thereof;

C.  On Count III, declaratory judgment in favor of the Committee and against the Term Loan Agent, under section 506 of the Bankruptcy Code and Bankruptcy Rules 7001(2) and (9), that Prepetition Liens do not attach to the Trade Service Equity and the Debtors' equity interests in the Digitally Native Brands and any proceeds thereof;

D.  On Count IV, judgment in favor of the Committee and against the Term Loan Agent,

under section 544(b) of the Bankruptcy Code, avoiding as unperfected the Prepetition Liens against the Trade Service Equity and the Debtors' equity interests in the Digitally Native Brands and any proceeds thereof;

E. On Count V, declaratory judgment in favor of the Committee and against the Term Loan Agent, under section 506 of the Bankruptcy Code and Bankruptcy Rules 7001(2) and (9), that the Prepetition Liens do not attach to the Debtors' Avoidance Actions and any proceeds thereof;

F. On Count VI, judgment in favor of the Committee and against the Term Loan Agent, under section 544(b) of the Bankruptcy Code, avoiding as unperfected the Prepetition Liens against the commercial tort claims and any proceeds thereof;

G. On Count VII, judgment in favor of the Committee and against Quality King, Reckitt, McKesson Ventures, Scott Emerson, Emerson Healthcare, and Shanklin under section 544(b) of the Bankruptcy Code and other applicable law, avoiding the Release as an intentionally fraudulent transfer;

H. On Count VIII, judgment in favor of the Committee and against Quality King, Reckitt, McKesson Ventures, Scott Emerson, Emerson Healthcare, and Shanklin under section 544(b) of the Bankruptcy Code and other applicable law, avoiding the Release as a constructively fraudulent transfer;

I. On Count IX, judgment in favor of the Committee and against the Term Loan Agent, Reckitt, Quality King, McKesson Ventures, Vagenas, Castle Ridge, Tramunti, Gioia, Mastronardi, JFMW, Webb, Berkowitz, 710 Holdings, Emerson, and Shanklin, recharacterizing the Remaining Term Loan Claim pursuant to the Term Loan as equity;

J. On Count X, judgment in favor of the Committee and against the Term Loan Agent, Reckitt, Quality King, McKesson Ventures, Vagenas, Castle Ridge, Tramunti, Gioia, Mastronardi, JFMW, Webb, Berkowitz, 710 Holdings, Emerson, and Shanklin equitably subordinating the obligations under the Remaining Term Loan Claim to the claims of general unsecured creditors under section 510(c) of the Bankruptcy Code;

K. On Count XI, judgment in favor of the Committee and against Quality King, Quality Fragrance, Pro's Choice, Ultra, Reckitt, RB HyHo, Mead Johnson, McKesson Medical, McKesson Minnesota, Sealed Air, APS, and Emerson Healthcare under section 547 of the Bankruptcy Code and other applicable law, avoiding the One Year Transfers as preferential transfers;

L. On Count XII, judgment in favor of the Committee and against Quality King, Quality Fragrance, Pro's Choice, Ultra, Reckitt, RB HyHo, Mead Johnson, McKesson Medical, McKesson Minnesota, Sealed Air, APS, and Emerson Healthcare under section 548 of the Bankruptcy Code and other applicable law, avoiding the One Year Transfers as intentionally fraudulent transfers;

M. On Count XIII, judgment in favor of the Committee and against Quality King, Quality Fragrance, Pro's Choice, Ultra, Reckitt, RB HyHo, Mead Johnson, McKesson Medical, McKesson Minnesota, Sealed Air, APS, and Emerson Healthcare under section 548 of the Bankruptcy Code and other applicable law, avoiding the One Year Transfers as constructively fraudulent transfers;

N. On Count XIV, judgment in favor of the Committee and against Quality King, Castle Ridge, Milend, Berkowitz, Webb and PPJDM under section 548 of the Bankruptcy Code and other applicable law, avoiding the Redemption Payments as intentionally fraudulent transfers;

O. On Count XV, judgment in favor of the Committee and against Quality King, Castle Ridge, Milend, Berkowitz, Webb and PPJDM under section 548 of the Bankruptcy Code and other applicable law, avoiding the Redemption Payments as constructively fraudulent transfers;

P. On Count XVI, judgment in favor of the Committee and against Quality King, Quality Fragrance, Pro's Choice, Ultra, Reckitt, RB HyHo, Mead Johnson, McKesson Medical, McKesson Minnesota, Sealed Air, APS, Emerson Healthcare, Castle Ridge, Milend, Berkowitz, Webb and PPJDM under section 550 of the Bankruptcy Code and other applicable law, avoiding the Avoidable Transfers and directing the applicable defendants to return the Avoidable Transfers plus pre- and post-judgment interest from the date of demand at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action, including, without limitation, attorneys' fees;

Q. On Count XVII, judgment in favor of the Committee and against Term Loan Agent, Vagenas, Tramunti, Mastronardi, Berkowitz, Quality King, Reckitt, Mead Johnson, RB HyHo, McKesson Medical, McKesson Minnesota, Quality Fragrance, Pro's Choice, Ultra, Sealed Air, APS, Emerson Healthcare, Castle Ridge, Milend, Webb and PPJDM, disallowing the claims filed by such defendants under sections 502(d) and (j) of the Bankruptcy Code;

R. On Count XVIII, judgment in favor of the Committee and against Berkowitz, Emerson, Castle Ridge, Milend, Webb, PPJDM, Quality King Distributors, Inc., RB Health (US) LLC, McKesson Ventures, LLC, and Sealed Air Corporation (US) Systems for breaches of the Operating Agreements plus pre- and post-judgment interest from the date of demand at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action, including, without limitation, attorneys' fees;

S. On Count XIX, declaratory judgment in favor of the Committee and against Vagenas, Tramunti, Mastronardi, Berkowitz, Quality King, Emerson, the Emerson Entities, Castle Ridge, Milend, Webb, PPJDM, Gioia, JFMW, Quality King Distributors, Inc., Quality King Fragrances, Inc., Olla Beauty Supply, LLC, Pro's Choice Beauty Care, Inc., Deborah International Beauty Ltd., Glenn Nussdorf, RB Health (US) LLC, Reckitt

Benckiser LLC, Mead Johnson & Company LC, McKesson Ventures, LLC, McKesson Corporation, McKesson Medical-Surgical Minnesota Supply Inc., Sealed Air Corporation (US), Shanklin Corp., Automated Packaging Systems, Nitish Kapoor, Thomas Rodgers, Arjun Purkayastha, and Carrie Williams, that the foregoing defendants breached their fiduciary duty of loyalty, and granting any and all equitable relief, including the following: (i) invalidating and rescinding and returning the redemption payments and Term Loans to the Debtors; (ii) recharacterizing the Term Loans as equity, (iii) rescinding or unwinding all transfers received by the Managers and/or the Intervening Entities in which the Managers are agents, (iv) reversing, disgorging, and any granting any other equitable relief as to all redemption payments, and (v) specific performance unwinding the redemption transaction as a result of the breaches of the foregoing defendants;

T. On Count XX, judgment in favor of the Committee and against Vagenas, Tramunti, Mastronardi, Berkowitz, and Webb, that the foregoing defendants breached their fiduciary duty of care;

U. On Count XXI, judgment in favor of the Committee and against Berkowitz, Emerson, Castle Ridge, Milend, Webb, PPJDM, Quality King Distributors, Inc., RB Health (US) LLC, McKesson Ventures, LLC, and Sealed Air Corporation (US) Systems, that the foregoing defendants breached their duty of good faith and fair dealing;

V. On Count XXII, if there is no adequate remedy at law, (a) judgment in favor of the Committee and against Reckitt, Quality King, McKesson Ventures, Castle Ridge, Gioia, JFMW, Mr. Webb, 710 Holdings, Mr. Emerson, Shanklin, Milend, Berkowitz, and PPJDM, that the foregoing defendants were unjustly enriched, and (b) granting any and all equitable relief, including the following: (i) reversing and disgorging all Redemption Payments, and (ii) specific performance unwinding all transactions stemming from the Enriched Defendants improper obtainment or use of confidential information and competitively sensitive information;

W. On Count XXIII, if there is no adequate remedy at law, granting any and all equitable relief, including the following: (i) judgment in favor of the Committee and against Vagenas, Tramunti, Mastronardi, Quality King, the Emerson Entities, Quality King Distributors, Inc., Quality King Fragrances, Inc., Olla Beauty Supply, LLC, Pro's Choice Beauty Care, Inc., Deborah International Beauty Ltd., Glenn Nussdorf, RB Health (US) LLC, Reckitt Benckiser LLC, Mead Johnson & Company LC, McKesson Ventures, LLC, McKesson Corporation, McKesson Medical-Surgical Minnesota Supply Inc., Sealed Air Corporation (US), Shanklin Corp., and Automated Packaging Systems, that the foregoing defendants were unjustly enriched, (ii) reversing and disgorging all Redemption Payments, (iii) specific performance unwinding the redemption transaction and all transactions stemming from the Enriched Defendants improper obtainment or use of confidential information, competitively sensitive information, and opportunities, and (iv) disgorging all improperly obtained benefits if there is no adequate remedy at law;

X.   On Count XXIV, judgment in favor of the Committee and against Term Loan Agent, Quality King, Emerson, the Emerson Entities, Castle Ridge, Milend, PPJDM, Quality King Distributors, Inc., Quality King Fragrances, Inc., Olla Beauty Supply, LLC, Pro's Choice Beauty Care, Inc., Deborah International Beauty Ltd., Glenn Nussdorf, RB Health (US) LLC, Reckitt Benckiser LLC, Mead Johnson & Company LC, McKesson Ventures, LLC, McKesson Corporation, McKesson Medical-Surgical Minnesota Supply Inc., Sealed Air Corporation (US), Shanklin Corp., and Automated Packaging Systems that the foregoing defendants aided and abetted the other defendants in their breach of their fiduciary duties; and

Y.   On Count XXV, judgment in favor of the Committee and against Term Loan Agent, Vagenas, Tramunti, Mastronardi, Quality King, the Emerson Entities, Quality King Fragrances, Inc., Olla Beauty Supply, LLC, Pro's Choice Beauty Care, Inc., Deborah International Beauty Ltd., Glenn Nussdorf, Reckitt Benckiser LLC, Mead Johnson & Company LC, McKesson Corporation, McKesson Medical-Surgical Minnesota Supply Inc., Shanklin Corp., Automated Packaging Systems, Nitish Kapoor, Thomas Rodgers, Arjun Purkayastha, and Carrie Williams that the foregoing defendants aided and abetted the other defendants in their breaches of the Operating Agreements; and

Z.   On Count XXVI, judgment in favor of the Committee and against Term Loan Agent, Vagenas, Tramunti, Mastronardi, Quality King, the Emerson Entities, Quality King Fragrances, Inc., Olla Beauty Supply, LLC, Pro's Choice Beauty Care, Inc., Deborah International Beauty Ltd., Glenn Nussdorf, Reckitt Benckiser LLC, Mead Johnson & Company LC, McKesson Corporation, McKesson Medical-Surgical Minnesota Supply Inc., Shanklin Corp., Automated Packaging Systems, Nitish Kapoor, Thomas Rodgers, Arjun Purkayastha, and Carrie Williams that the foregoing defendants tortiously interfered with the Operating Agreements;

AA.  For all counts seeking monetary relief, pre- and post-judgment interest from the date of demand at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action, including, without limitation, attorneys' fees; and

BB.  Such other and further relief as this Court deems just and proper.


Dated: March 22, 2024                    **A.M. SACCULLO LEGAL, LLC**

                                         */s/ Mary E. Augustine*
                                         Anthony M. Saccullo (DE No. 4141)
                                         Mark T. Hurford (DE No. 3299)
                                         Mary Augustine (DE No. 4477)
                                         27 Crimson King Drive
                                         Bear, DE 19701
                                         Telephone: (302) 836-8877
                                         Facsimile: (302) 836-8787

Email: ams@saccullolegal.com
       mark@saccullolegal.com
       meg@saccullolegal.com

-and-

**ASK LLP**
Nicholas C. Brown, Esq.
(admitted *pro hac vice*)
2600 Eagan Woods Drive, Ste. 400
St. Paul, MN 55121
Telephone: (651) 289-3846
Facsimile: (651) 406-9676
Email: nbrown@askllp.com

*Counsel to the Official Committee of Unsecured Creditors*