## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Pack Liquidating, LLC (f/k/a Packable Holdings, LLC), *et al.*,<br><br>    Debtors. | Chapter 11<br><br>Case No. 22-10797 (CTG)<br><br>(Jointly Administered) |
| Official Committee of Unsecured Creditors of Pack Liquidating, LLC, *et al.*, derivatively, on behalf of the debtors' estate,<br><br>    Plaintiff,<br><br>    v.<br><br>Andrew Vagenas, *et al.*,<br><br>    Defendants. | Adv. Proc. No. 23-50590 (CTG)<br><br>**Related Docket No. 101** |

## <u>MEMORANDUM OPINION</u>

This action involves claims that have been made against various entities and individuals associated with Quality King Distributors. The claims arise out of the defendants' relationship with Packable and its affiliates, which are the debtors in the underlying bankruptcy case.[1] The debtors' business involved selling health and wellness products through various e-commerce platforms. The business grew

---

[1] This Memorandum Opinion is limited to addressing the motion to strike [D.I. 101] and the motion to dismiss [D.I. 51] filed by one group of defendants who are affiliated with Quality King. "Quality King" refers to Quality King Distributors, Inc. The defendants who have brought these motions are Quality King, Glenn Nussdorf, Quality King Fragrances, Inc., Olla Beauty Supply, LLC, Pro's Choice Beauty Care, Inc., and Deborah International Beauty Ltd. "QK Entities" refers to these defendants other than Nussdorf.

substantially in the period from its founding in 2014 until its implosion in 2022. But despite the growth in revenues, it never achieved profitability. After an effort to raise capital via a proposed SPAC merger fell through in late 2021, the company ultimately spiraled into bankruptcy.

In addition to being a supplier of the debtors, Quality King was also an early investor. As a result of its equity holdings, Quality King's principal, Glenn Nussdorf, sat on the debtors' board of directors. The complaint asserts something of a hodgepodge of bankruptcy and common law causes of actions in an effort to hold the defendants responsible for the ultimate demise of the debtors' business. The Court concludes that these efforts are generally unsuccessful.

As an initial matter, the Committee (which has obtained standing to assert estate causes of action) filed a second amended complaint without obtaining consent or seeking leave of court. While they advance an argument about why Rule 15 permits them to do this, the argument is a weak one. That said, the violation is ultimately a no-harm/no-foul situation, as their alternative argument for leave to file the amended complaint ultimately lands us in the same place we would have been had leave to file been permitted – assessing the question whether the complaint as amended states a claim for which relief can be granted. So either way, the question before the Court is whether the second amended complaint states a claim.

The answer is that it mostly does not. The complaint does properly assert preference claims with respect to certain payments that were made within 90 days of the bankruptcy filing. And because it states a valid preference claim, the complaint

also states a valid claim to disallow the proofs of claim, under § 502(d), asserted by those defendants who are alleged to be recipients of transfers within the 90 days. The rest of the complaint, however, fails to state a claim and will therefore be dismissed.

The actual fraudulent conveyance claims fail because the complaint does not allege fraud with particularity, as required under Rule 9(b). The constructive fraudulent conveyance claims relating to transfers alleged to have occurred before the end of 2021 fail because there is no non-conclusory factual allegation of the debtors' insolvency before that time. And the constructive fraudulent conveyance claims relating to transfers that occurred after that time fail because there is no allegation that the debtors did not receive reasonably equivalent value in exchange for the transfers in question.

The various common law causes of action are unsuccessful because, in connection with loans that Quality King made to the debtors in 2022, the debtors granted valid releases to the Quality King defendants.

The Committee's preference claims relating to transfers made more than 90 days before the bankruptcy fail because the complaint does not allege that the recipients of those transfers are insiders – either on the ground that they exercised control over the debtors or that they are "non-statutory" insiders on account of non-arm's-length transactions between the parties.

The claims for equitable subordination are unsuccessful in the absence of an otherwise sufficient allegation of wrongdoing; and the effort to recharacterize the loans as equity also fail. Accordingly, while the claims for preference and § 502(d)

disallowance are sufficient to survive a motion to dismiss, the rest of the complaint is not.

## Factual Background

Pharmapacks was founded in 2010 by Andrew Vagenas, Bradley Tramunti, and James Mastronardi as an e-commerce venture selling health and wellness products.[2]

### 1.   Quality King investment (2014)

In 2014, as part of an effort to raise capital, the founders formed a holding company, known as Packable Holdings.[3]  Each of the founders originally held a one-third interest in the holding company.  In August 2014, Jonathan Webb, Adam Berkowitz, and Quality King collectively paid $500,000 for 50 percent of the equity of the holding company.[4]

Quality King is alleged to be a "retail diverter" – a company that purchases products that are intended for a particular retail channel and sells those products into an alternative channel.[5]  At the same time that it acquired equity in the holding

---

[2] D.I. 98 ¶¶ 59-60.  The description of the facts set forth herein is based on the allegations made in the second amended complaint, which allegations are taken as true for the purposes of the present motion.

[3] The entity originally known as Entourage Commerce LLC later became Packable Holdings, LLC.  That entity has since been renamed Pack Liquidating LLC.  D.I. 98 ¶ 21.

[4] D.I. 98 ¶ 67.

[5] *Id.* ¶ 68 ("Retail Diverters operate at the fringe of the mainstream distribution channels and 'divert' the sale of merchandise intended for a particular, premium distribution channel into another, alternate distribution channel, often at steep discounts.")

company, Quality King made a revolving loan to the debtors under which it provided up to $9 million in financing.[6]

That capital fueled rapid revenue growth – from $17.5 million in 2013, to $31 million in 2014, and $66.6 million in 2015.[7]  But despite the growth in revenues, Pharmapacks remained unprofitable, recording net losses of $1.7 million in 2015.[8] Over the next several years, the net losses of the debtors persisted and the debt obligations to Quality King continued to grow, reaching a balance of $33 million by the end of 2018.  At that point, Quality King refused to extend further credit.[9]

### 2.    Investments by suppliers (2018)

In need of additional capital, Pharmapacks then turned to its existing suppliers.  The company raised $32.5 million in Series A preferred equity in 2018 from Reckitt, McKesson, Sealed Air, and Emerson, a portion of which was used to reduce the outstanding Quality King Loan by $6 million.[10]  As a result of the change in the company's ownership structure, the Holdings LLC Agreement was amended to expand the board of managers to nine members – one of whom was Glenn Nussdorf, the CEO of Quality King. [11]

---

[6] *Id.* ¶ 71.

[7] *Id.* ¶ 72.

[8] *Id.*

[9] *Id.* ¶ 90.

[10] D.I. 98 ¶ 93.

[11] *Id.* ¶ 94.

### 3.      MGG loan (2019)

In 2019, the company conducted a further refinancing, securing a $75 million credit facility from an entity known as MGG Investment Group, the proceeds of which were used to repay the Quality King loan in its entirety.[12]   Quality King, however, retained its equity interest and Nussdorf remained on the company's board.

### 4.      Carlyle transaction and insider redemptions (November 2020)

In November 2020, Carlyle invested approximately $215 million in a Series B preferred equity offering.  The Board approved the use of the proceeds of this equity offering to redeem the equity interests held by the prior equity holders.[13]   Quality King redeemed its equity interest, at a price of $60.25 per unit – the same price at which the company issued new equity interests to Carlyle.  Quality King accordingly received more than $27 million in proceeds from this equity redemption.[14]

At the same time, the Board was reconstituted.  Carlyle was granted two seats; Reckitt, McKesson, and Sealed Air each received one; the founders retained three; Nussdorf also remained on the board.[15]

### 5.      SPAC efforts and Quality King liens (2021 – March 2022)

In 2021, Pharmapacks pursued a SPAC merger with Highland Transcend Partners, based on a projected an equity value of the company of $1.9 billion.[16]   But

---

[12] *Id.* ¶ 95.

[13] *Id.* ¶¶ 103-108.

[14] *Id.* ¶¶ 113-114.

[15] *Id* ¶ 114.

[16] D.I. 98 ¶¶ 121, 124.

by late 2021, Deloitte issued "going concern" qualifications, citing negative cash flows and covenant issues under the company's debt facilities.[17]  The company's balance sheet showed that as of the end of 2021, the debtors' liabilities exceeded the value of their assets.[18]

By March 2022, the company's liquidity had essentially collapsed.[19] Pharmapacks owed various vendors more than $42 million for goods they had previously shipped.  Some of these unpaid vendors withheld further shipments.[20] Quality King refused to ship new product until the receivables due to it were reduced. Between March 1 and March 15, 2022, Quality King filed three liens against the debtors' assets.[21]  On March 16, 2022, the SPAC merger was terminated, and Holdings paid a $10 million break-up fee.[22]

### 6.    Quality King's role in the April 2022 term loan

On April 14, 2022, Pharmapacks entered into a term loan credit agreement with a syndicate including Carlyle, Reckitt, McKesson, Sealed Air, Emerson, Castle Ridge, Webb, and Quality King.[23]  The initial funding consisted of $77 million of new money, plus the conversion of $9 million in trade debt to secured term debt.[24]  As part

---

[17] *Id.* ¶ 119.

[18] *Id.* ¶ 281.

[19] *Id.* ¶ 138.

[20] *Id.* ¶¶ 139-140.

[21] *Id.* ¶¶ 143-144.

[22] D.I. 98 ¶¶ 148, 153.

[23] *Id.* ¶ 170.

[24] *Id.* ¶¶ 171-173.

of the transaction, the debtors executed a broad release in favor of all lenders, including Quality King, discharging them and their affiliates from any and all claims relating to their prior conduct, investments, or dealings with the debtors.[25]

At the same time, Pharmapacks and Quality King entered into a memorandum of understanding.[26]  Under that memorandum, Pharmapacks agreed to pay Quality King, within four weeks, $5 million on account of outstanding receivables. Pharmapacks further agreed to pay Quality King the rest of the outstanding receivables balance within 180 days.[27]  In exchange, Quality King agreed to resume supplying goods.  The debtors made the first $2.5 million payment in May 2022, but Quality King withheld new shipments thereafter.[28]  When Mastronardi pleaded with Nussdorf to release purchase orders, Nussdorf rejected the request, stating the receivables must be further reduced before any orders would be filled.[29]

### 7.    Bridge loan and bankruptcy filing (July - August 2022)

By July 2022, the debtors had exhausted the April 2022 term loan proceeds.[30] When Carlyle and other lenders refused further participation unless other interested parties contributed, the term loan syndicate – including Quality King – extended an

---

[25] *Id.* ¶ 178.

[26] *Id.* ¶ 181.

[27] *Id.*

[28] D.I. 98 ¶ 186.

[29] *Id.* ¶ 186.

[30] *Id.* ¶ 190.

$8.7 million bridge loan on July 21, 2022.[31]  Like the term loan, the bridge loan contained broad general releases.[32]

On August 28, 2022, Pharmapacks filed for chapter 11.[33]  In the year leading up to the filing, lenders including Quality King had received more than $70 million in payments.[34]  During the bankruptcy, inventory valued at roughly $70 million was sold at auction, with Quality King purchasing a substantial portion.[35]

## Procedural Background

In September 2023, the Committee filed its initial complaint in this adversary proceeding.[36]  In March 2024, the Committee filed its first amended complaint.  That filing was made as a matter of right under Rule 15(a)(1) of the Federal Rules of Civil Procedure, as made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7015.[37]  The defendants filed their motion to dismiss the first amended complaint in June 2024, for failure to state a claim upon which relief may be granted.[38]  The Committee did not oppose this motion.  Instead, it filed a second amended complaint.  It did so, however, without seeking leave of this Court or with permission from the defendants.[39]  The defendants subsequently filed their motion to

---

[31] *Id.*

[32] *Id.* ¶ 191.

[33] *Id.* ¶ 20.

[34] D.I. 98 at ¶ 193.

[35] *Id.* ¶ 192.

[36] D.I. 1.

[37] D.I. 8; Fed. R. Civ. P. 15(a)(1).

[38] D.I. 51.

[39] D.I. 98.

9

strike the second amended complaint, or in the alternative, renewed their motion to dismiss.[40]   The Court heard argument on these matters in May 2025, and now resolves the motions as set out below.

## Jurisdiction

Certain of the claims (those for preference, fraudulent conveyance, and equitable subordination) arise under the Bankruptcy Code and are thus within the district court's "arising under" jurisdiction set out in 11 U.S.C. § 1334(b).[41]   The common-law claims are within section 1334(b)'s "related to" jurisdiction because the resolution of those claims would have a "conceivable effect" on the estate.[42]   These cases have been referred to this Court under 28 U.S.C. § 157(a) and the district court's February 29, 2012 standing order of reference.

## Analysis

## I.     The Court will (reluctantly) deny the motion to strike.

Rule 15(a)(1) provides that "a party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."[43]   Rule

---

[40] D.I. 101.

[41] *In re Atamian*, 368 B.R. 375, 379 (Bankr. D. Del. 2007) (citing *Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006)).

[42] *In re Fairchild Corp.*, 452 B.R. 525, 530 (Bankr. D. Del. 2011).

[43] Fed. R. Civ. P. 15(a)(1).

15(a)(2) goes on to explain that in "all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave."[44]

That language is just about as clear as English gets. A party gets *one* amendment as of right. Second and subsequent amendments must be with consent or on leave of the court. The court in *Logue* put the point simply: "Once means once."[45] The Committee's textual argument, as far as it goes, is that even after amending its complaint once under Rule 15(a)(1)(A), it may *also* amend it once under Rule 15(a)(1)(B).[46] The problem with this reading is that this would read the word "or," which comes between Rule 15(a)(1)(A) and (a)(1)(B), to mean "and." But just as "once" means "once", "or" means "or".

The Committee argues that its reading is supported by a decision of the New Jersey District Court in *Getty Petroleum*.[47] It is true that the court in *Getty Petroleum*, on its facts, permitted the filing of a second amended complaint under Rule 15(a)(1)(B) as a matter of right. But that court's analysis never engages the question whether the fact that the plaintiff had previously amended the complaint under Rule 15(a)(1)(A) ought to affect the analysis. Perhaps that was because the

---

[44] Fed. R. Civ. P. 15(a)(2).

[45] *Logue v. Patient First Corp.*, 246 F. Supp.3d 1124, 1127 (D. Md. 2017). *See also United States ex rel. D'Agostino v. EV3, Inc.*, 802 F.3d 188, 192 (1st Cir. 2015) ("Once a party has exhausted its one-time right to amend as a matter of course, it may make further amendments only with the opposing party's consent or with leave of court."); *Innovative Water Consulting, LLC v. SA Hosp. Acquisition Group, LLC*, No. 22-00500, 2023 WL 130531 (S.D. Ind. Jan. 9, 2023) (same).

[46] *See* D.I. 139 at 54.

[47] *Route 27, LLC v. Getty Petroleum Marketing, Inc.*, No. 10-3080, 2011 WL 1256618 (D. N.J. Mar. 30, 2011).

defendant in that case did not object to leave to amend on Rule 15 grounds.[48]  In any event, the decision cannot be squared with the language of the rule.  That rule permits one amendment as a matter of course under Rule 15(a)(1).  Second and subsequent amendments are governed by Rule 15(a)(2).

The Committee argues in the alternative that even if leave was required, the Court should now grant it leave to amend.[49]  The problem with that argument is that it seems to reward the Committee for approaching Rule's 15's requirement that a plaintiff obtain permission for leave to amend as, in effect, affording it the option *either* to obtain permission beforehand or to beg for forgiveness afterwards.  That is not what the rule provides, and the Court has given serious consideration to denying the motion for leave to amend as a form of sanction for the Committee's flouting of the rules.  In the end, however, the Court concludes that such a "sanction" would be an overreaction to what is, in fairness, a technical violation of the rules.  The Supreme Court has recently emphasized that "the spirit of the Federal Rules is that decisions on the merits should not be avoided on the basis of mere technicalities."[50]

Following this admonition, the Court concludes that it has little choice but to, in effect, disregard the Committee's violation of Rule 15.  Instead, it will proceed as if it had before it a properly filed motion for leave to amend.  In such a case, "leave must be granted in the absence of undue delay, bad faith, dilatory motive, unfair

---

[48] *Id.*, at *3 ("in their briefing, Defendants do not contend that Plaintiffs may not file their Second Amendment Complaint as of right").

[49] D.I. 139 at 55-56.

[50] *Parrish v. United States*, 145 S. Ct. 1664, 1674 (2025) (cleaned up).

prejudice, or futility of amendment."[51]  There is no basis in the record for a finding that the Committee acted with improper purpose or motive, or for a finding of prejudice.  And the question of futility asks, in substance, whether the second amended complaint would survive a motion to dismiss.[52]  The Court accordingly concludes that it is appropriate to proceed as if, in effect, the complaint has been amended and simply treat the defendants' motion to dismiss as being applicable to the second amended complaint.  Even proceeding on this basis, however, the Court concludes, for the reasons described below, that most (although not all) of the second amended complaint should be dismissed.

## II.   Most (but not all) of the second amended complaint should be dismissed.

The Court's task when considering a motion to dismiss is to determine whether the complaint's factual allegations are plausible and sufficient to state the claims alleged.[53]  Under Rule 8(a) of the Federal Rules of Civil Procedure, a complaint must include a "short and plain statement" showing that the plaintiff is "entitled to relief."[54]  The Supreme Court, in *Iqbal* and *Twombly*, made clear that plaintiffs

---

[51] *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002).

[52] *See Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) ("'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted.  In assessing 'futility,' the District Court applies the same standard of legal sufficiency as applies under Rule 12(b)(6).") (internal citation omitted).

[53] *In re DBSI, Inc.*, 447 B.R. 243, 246 (Bankr. D. Del. 2011); *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993); *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (determining a claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged).

[54] Fed. R. Civ. P. 8(a)(2) (made applicable to this proceeding by Rule 7008 of the Federal Rules of Bankruptcy Procedure).

cannot "merely recite elements of a cause of action."[55]  Such allegations should be disregarded as conclusory.  Rather, a complaint must contain actual factual allegations that support the alleged claim.  Accordingly, to survive a motion to dismiss brought under Rule 12(b)(6), a complaint must "contain plausible facts which state a claim."[56]  In addition, Rule 9(b) requires that plaintiffs plead allegations of fraud with particularity.[57]

Although ordinarily affirmative defenses (such as releases and the ordinary course of business defense) are raised by answer and then considered (with respect to the adequacy of the defense as pled) in a motion for judgment on the pleadings under Rule 12(c), they may be decided on a motion to dismiss when facts that give rise to the affirmative defense are themselves contained in the complaint or documents it references.[58]

---

[55] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007); *In re Liquid Holdings Grp., Inc.*, No. 17-50662 (KG), 2019 WL 3380820, at *1 (Bankr. D. Del. July 25, 2019).

[56] *Liquid Holdings*, 2019 WL 3380820, at *1.

[57] *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.")

[58] *See Leveto v. Lapina*, 258 F.3d 156, 161 (3d Cir. 2001) ("[A] complaint may be subject to dismissal under Rule 12(b)(6) when an affirmative defense … appears on its face."); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (documents "integral to or explicitly relied upon in the complaint" may be considered on a motion to dismiss).

A.    **The complaint fails to allege claims for fraudulent conveyance.**

1.    **The claims for actual fraudulent conveyance fail because the complaint fails to allege fraud with the particularity required by Rule 9(b).**

The Committee alleges that several transfers made by the debtors to the QK Entities were made with actual intent to hinder, delay, or defraud creditors.  To survive dismissal, the Committee must plead facts sufficient to support a plausible inference of fraudulent intent.  Section 548(a)(1)(A) requires a showing that (i) the transfers occurred within two years of the petition date, and (ii) the *debtors* made the transfers with the requisite fraudulent intent.

Although it is the intent of the transferor that is considered for a § 548(a)(1)(A) analysis, "[m]ost courts recognize that when a transferee is in a position to dominate or control the debtor's disposition of the property, the transferee's intent to hinder, delay, or defraud will be imputed to the debtor/transferor."[59]  The court in *Maxus* concluded that for this exception to apply, the Committee "must prove: (i) [the defendant] possessed the requisite intent to hinder, delay or defraud [the debtor's] creditors, (ii) [the defendant] was in a position to dominate or control [the debtor]; and (iii) this domination and control related to [the debtor's] disposition of the property."[60]

Because fraudulent intent is at the heart of the claim, it must be pled with particularity under Rule 9(b).  Where direct evidence is absent, courts may look to

---

[59] *In re Maxus Energy Corp.*, 641 B.R. 467, 512-13 (Bankr. D. Del. 2022) (internal citations omitted).

[60] *Id.*

15

badges of fraud, but even then, the allegations must contain concrete factual detail, not mere conclusory statements.[61]

The Committee's theory is that the QK Entities, (for the same reason they are alleged to be insiders) effectively controlled the debtors and thus directed the challenged transfers. That theory fails for two reasons. *First*, as discussed in greater detail below, the complaint has not plausibly alleged that the QK Entities dominated or controlled the debtors' disposition of property. While Nussdorf sat on the debtors' board, there are no factual allegations that he acted as an agent of the QK Entities or that those entities directed his conduct. Without a showing that the QK Entities could dominate or control the debtors, there is no basis to impute their intent to the debtors under the test set out in *Maxus*.

*Second*, even as to Nussdorf individually, the imputation theory fails. *Maxus* teaches that the intent of a controlling transferee may, in limited circumstances, be imputed to the debtor. But this Court's reasoning in *Cyber* explains that where the challenged conduct is an action that required approval of a corporate board, the relevant intent is that of a majority of the board. The Committee does not allege that a majority of the debtors' board acted with fraudulent intent, nor does it allege that Nussdorf's individual intent drove the

---

[61] *In re Fedders North America, Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009) (*In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 551 (D. Del. 2005)). The "badges of fraud" include, but are not limited to: (1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor over the property transferred; and (6) secrecy or concealment of the transaction.

board's decisions.   Accordingly, the Committee's reliance on Nussdorf's board membership to establish fraudulent intent on behalf of the debtors is misplaced.

Finally, even if the Court were to set aside these substantive deficiencies, the complaint falls short of Rule 9(b).  The allegations consist largely of generalized assertions that the QK Entities "controlled" the debtors or that Nussdorf "caused" the transfers to occur.  But the complaint makes no allegation about any specific communication, board deliberations, or factual circumstances that would support an inference of fraudulent intent.  Such conclusory allegations do not meet the heightened pleading requirement that fraud be pled with particularity.

Because the Committee has not plausibly alleged that the debtors acted with actual intent to hinder, delay, or defraud creditors – and because the complaint fails to satisfy Rule 9(b) – the claims under § 548(a)(1)(A) must be dismissed.

> **2.    The claims for constructive fraudulent conveyance fail because, as to the only transfers alleged to occur at a time when insolvency is sufficiently alleged, there is no allegation that the debtors did not receive reasonably equivalent value.**

In several counts of the amended complaint, the Committee seeks to avoid transfers to the defendants as constructive fraudulent conveyances under § 548(a)(1)(B) and state-law analogs under § 544(b).  All that is needed to plead a constructive fraudulent conveyance claim adequately is "an allegation that there was a transfer for less than reasonably equivalent value at a time when the [debtor was]

insolvent."[62]   Here, insolvency is sufficiently pled only as to those transactions that occurred after the end of 2021.  And as to those transactions, there is no allegation that the debtors did not receive reasonably equivalent value in exchange for those transfers.

> ### a.     Insolvency is not sufficiently pled until the end of 2021.

"Insolvency" is an element of a claim for constructive fraudulent conveyance. For this purpose, that effectively means that the debtor (i) was balance sheet insolvent at the time of the transfer (or became so as a result thereof); (ii) had unreasonably small capital; or (iii) was unable to pay its debts as those debts matured.[63]   A claim for constructive fraudulent conveyance accordingly requires factual allegations that would support such a determination.  "Mere recitations by a trustee that a debtor is insolvent are conclusory," and are therefore insufficient to survive a motion to dismiss.[64]

The complaint is replete with conclusory assertions of insolvency.  But the caselaw described above makes clear that such conclusory assertions ought to be disregarded.  As far as concrete factual allegations go, the allegation that the company was able to raise hundreds of millions of dollars in equity financing in late 2020 counsels strongly against any reading of the complaint that would suggest that

---

[62] *In re BMT-NW Acquisition, LLC*, 582 B.R. 846, 856 (Bankr. D. Del. 2018) (citing *In re AgFeed USA, LLC*, 546 B.R. 318, 336 (Bankr. D. Del. 2016)); citing *In re Pillowtex Corp.*, 427 B.R. 301, 310 (Bankr. D. Del. 2010) ("[C]ourts in this district have held that claims of constructive fraud (i.e., fraudulent transfers) are evaluated using Rule 8(a)(2).")).

[63] 11 U.S.C. § 548(a)(1)(B)(ii).

[64] *In re Amcad Holdings, LLC*, 579 B.R. 33, 38–39 (Bankr. D. Del. 2017).

the company was insolvent at that time. The first factual allegation that supports a claim of insolvency is the allegation that the company's October 2021 financials included a qualification expressing doubt about the company's ability to fund operations for the next 12 months and raising questions about the company's ability to proceed as a going concern.[65]

It is less than certain whether such a statement is sufficient to plead insolvency. But any such ambiguity is resolved by the allegation that the company's year-end 2021 audited financials showed that "liabilities exceeded assets by $60 million."[66] That is a text-book allegation of balance-sheet insolvency. Because the complaint does not allege that there were transfers between the time of the going concern qualification and the end of calendar year 2021, there is no need to parse the legal sufficiency of the going concern qualifications standing alone. It is clear that the complaint does allege insolvency with respect to transactions that occurred after the end of 2021. It does not, however, sufficiently plead insolvency as to any of the transfers that it alleges were made before that time.

> **b.** **Although insolvency has been pled sufficiently as of the end of 2021, the complaint fails to allege the absence of reasonably equivalent value for the transfers that occurred after that time.**

A determination whether the value a debtor received for a transfer was "reasonably equivalent" is necessarily a factual one, typically requiring comparisons of the value of the transfer with the consideration received in exchange for the

---

[65] D.I. 98 ¶ 119.

[66] *Id.* ¶ 281.

transfer. That said, a complaint must still sufficiently allege that the value received in exchange for the transfer was not reasonably equivalent. Here, the two categories of "transfers" that were alleged to have occurred after the debtors became insolvent were the payment of invoices to Quality King and the releases granted in connection with the term loan and the bridge loan. The complaint fails to allege that the consideration that the debtors received in connection with either of these types of transfers was not reasonably equivalent to the value of the transfers.

*The one-year invoice payments.* The Bankruptcy Code and Delaware statute both define "value" to include satisfaction of an antecedent debt.[67] Payments that satisfy an otherwise valid antecedent debt are accordingly made for reasonably equivalent value.[68] Here, there is no suggestion in the complaint that the payments did not, in fact, satisfy otherwise valid debts.[69] Accordingly, the Committee cannot claim that the invoice payments were not made for reasonably equivalent value.[70]

---

[67] 11 U.S.C. § 548(d)(2)(A); 6 *Del. C.* § 1304(a)(2).

[68] *See In re Opus E., LLC*, 528 B.R. 30, 83 (Bankr. D. Del. 2015); *Pashaian v. Eccelston Props., Ltd.*, 88 F.3d 77, 85 (2d Cir.1996) ("[T]he general rule is that the satisfaction of a preexisting debt qualifies as fair consideration..."); *In re Champion Enters.*, Adv. No. 10-50514, 2010 WL 3522132, at *18 (Bankr. D. Del. Sept. 1, 2010) ("The Court agrees with Defendants that generally under the Fraudulent Conveyance Act, satisfaction of an antecedent debt is 'fair consideration' for a conveyance.") (citations omitted).

[69] D.I. 98 ¶ 277 ("Each of the One Year Transfers was made for, or on account of, an antecedent debt or debts owed by the Debtors to one of the Preference Defendants before such One Year Transfers were made."); *see also id.* ¶ 276 ("Each of the Preference Defendants was a vendor and/or supplier to the Debtors . . . by virtue of supplying goods and/or services to or for the benefit of the Debtors . . . for which the Debtors were obligated to pay.").

[70] *See, e.g., In re Capmark*, 438 B.R. 471, 518 (Bankr. D. Del. 2010) ("Where a bona fide antecedent debt exists, a debtor's payment on account of that creditor's claim, even if it has the result of preferring that creditor over others, is not by itself a fraudulent transfer.")

The constructive fraudulent conveyance claim with respect to these payments thus fails to state a claim.

*The releases granted in connection with the term loan and the bridge loan.* The second amended complaint also alleges that the releases that were given to Quality King in connection with the two loans that Quality King made to the debtors were themselves fraudulent conveyances. Specifically, in connection with both the $10.5 million term loan and the $1.4 million bridge loan, the debtors granted releases to Quality King, its affiliates, and related individuals.

The Committee's primary argument for a lack of reasonable value rests on the fact that they contend the releases were over broad and disproportionate to the lending relationship. The complaint alleges that general releases were granted for the benefit not only of the Quality King entity that made the loan, but also for the benefit of affiliates of and individuals associated with Quality King. The defendants argue that the plaintiffs have not satisfied their burden of demonstrating a lack of reasonably equivalent value. The Court agrees with the defendants that the Committee has not plausibly alleged that, in these transactions, the estate did not receive reasonably equivalent value.

As the Third Circuit has noted, "a party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'"[71] In addressing the question whether a debtor received reasonably equivalent value, a court looks to the totality

---

[71] *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) (internal citations omitted).

of the circumstances of the transfer, including the following factors: (i) the "fair market value" of the benefit received as a result of the transfer, (ii) "the existence of an arm's-length relationship between the debtor and the transferee," and (3) the transferee's good faith.[72]

Taking all the facts in the complaint as true and drawing all reasonable inferences in favor of the Committee, the complaint fails to allege a lack of reasonably equivalent value. The complaint recognized that at the time that Quality King elected to extend credit by making the loans in question, the debtors had effectively exhausted all efforts to obtain a third-party loan. "[T]he Board … acknowledged that no reasonable investor or commercial lender would invest additional equity or extend additional debt to Holdings given its precarious financial position."[73]

Under these circumstances, the fact that the loan terms included a release for the lender and related parties is woefully inadequate to suggest that the terms did not reflect reasonably equivalent value. Counsel for the Committee correctly recognized, simply as a matter of the market dynamics, that "certainly a release was going to come with the term loan."[74] In connection with a loan that brought in $80 million of new money to a company then in serious financial distress and that had exhausted its efforts to obtain needed capital from other sources, it cannot fairly be

---

[72] *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006) (quoting *In re R.M.L.*, 92 F.3d 139, 148-49, 153 (3d Cir. 1996)).

[73] D.I. 98 ¶ 156.

[74] May 29, 2025 Hr'g Tr. at 73.

said that the terms of the release as alleged here render the transaction one in which the debtors did not receive reasonably equivalent value.

The fraudulent conveyance actions against the defendants that seeks to avoid the releases granted in connection with the term loan and the bridge loan do not allege claims that are plausible under the standards laid out in *Iqbal* and *Twombly*. Those claims will accordingly be dismissed.

### B.   Because the defendants are validly released, the common law claims will be dismissed.

The Committee has pled various common law causes of action against the defendants, including breach of contract, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, unjust enrichment, aiding and abetting breach of fiduciary duty, aiding and abetting breach of contract, and tortious interference with contract.

Other than their unsuccessful effort to set aside the releases on the grounds that the releases themselves amounted to fraudulent conveyances, the Committee does not otherwise take issue with the validity or enforceability of the general releases.  Because the common law claims all fall within the ambit of those releases, they fail to state a claim for which relief may be granted.

"Delaware courts recognize the validity of general releases."[75]  To that end, "general releases are common," "their validity is unchallenged," and "a general

---

[75] *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1163 (Del. 2010).

release that waives all known or unknown claims" is enforceable under Delaware law.[76] The releases here provide that the debtors:

> forever waive[], release[] and discharge[] each Released Party from any and all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Releasing Parties, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Releasing Parties would have been legally entitled to assert in their own right . . . based on or relating to, or in any manner arising from, in whole or in part, any fact, act or omission, transaction, agreement, event or other occurrence or circumstance related to the Company or transactions relating to the Company existing or taking place on or before such Effective Date, including, without limitation, the operation, management, financing, or business affairs of the Company, the purchase, sale, issue or rescission of the purchase, sale or issue of any security, share, or interest of the Company . . .[77]

The common law claims are barred by the plain language of the releases. The asserted common law claims all arise from conduct alleged to predate the releases, and each count arises out of transactions and conduct alleged to have occurred in connection with the debtors. The various common law claims must therefore be dismissed.

> **C.    Because the complaint fails to allege that the preference defendants are insiders, the preference claims arising out of transfers more than 90 days before the petition date will be dismissed.**

Under § 547(b)(4), a transfer that otherwise meets the criteria to be avoided as a preference may be avoided if it was made to a non-insider within 90 days of the

---

[76] *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 55 A.3d 330, 336 (Del. 2012).

[77] Meloro Decl. Ex. 4, Term Loan Release § 2(a) (emphasis added). The bridge loan release contains similar language. D.I. 98 ¶ 191.

petition date, or if it was made to an insider in the period between 90 days and one year of the petition date.  Many of the transfers that the Committee seeks to avoid as preferential are alleged to have occurred outside the 90-day period, so can only be avoided if the transferee is an "insider" of the debtor as that term is defined in § 101(31) of the Bankruptcy Code.

> ### 1.    The complaint fails to allege that Quality King is a statutory insider.

Neither party disputes that Nussdorf is a statutory insider of the debtors by virtue of his role as a manager and board member.[78]  The issue turns on whether the Quality King Entities themselves qualify as insiders under § 101(31).[79]  The Committee's position rests one argument: they contend that the defendants' ability to select a member to the debtors' board effectively makes each of them a statutory insider within the definition of § 101(31)(B)(iii), by virtue of their "control" over the debtors.[80]  Essentially, the argument is that Nussdorf was acting as an agent of the QK Entities, and that the QK Entities thereby controlled the debtors.

---

[78] D.I. 52 at 26.

[79] *See* 11 U.S.C. § 101(31)(B)(i).

[80] D.I. 139 at 31-32 ("As their officer and/or director, Nussdorf was an agent of the Quality King Entities, representing their interests and acting on their behalf.  SAC at ¶¶ 39, 44, 84.  Nussdorf controlled the Quality King Entities with regard to their transactions with the Debtors. SAC at ¶¶ 81-83.  The fact that Nussdorf was the named Manager rather than the Quality King Entities is a distinction without a difference; the Quality King Entities participated on the Board through their agent, Nussdorf.  Therefore, the Quality King Entities were *de facto* managers of the Debtors and qualify as statutory insiders.") (emphasis in original).

Courts have consistently held that "actual control (or its close equivalent)" is required to meet this statutory standard.[81]  Allegations that an entity monitored a company's business and attended board meetings is insufficient to assert a claim that depends on actual control.[82]  Rather, there must be a showing that the entity exercised "day-to-day control" over the company's business affairs.[83]  The entity must have so significant a role in the "the company so as to dictate corporate policy and disposition of corporate assets *without limits*."[84]

The allegations here fall short of that standard.  The Committee points to transactions such as loans, equity stakes, and redemptions.  None of that, however, approaches the type of day-to-day managerial control required by the case law.  There is no allegation suggesting that the QK Entities directed the debtors' daily operations or exercised unfettered authority over corporate decisions.  Nussdorf's alleged participation in board discussions regarding transactions between the debtors and

---

[81] *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 396 (3d Cir. 2009).

[82] *In re Radnor Holdings Corp.*, 353 B.R. 820, 840-841 (Bankr. D. Del. 2006) (internal citations omitted) ("TCP was not an insider for purposes of equitable subordination, as it was not a 'person in control of the debtor.'  Evidence that TCP monitored the Company's business and attended Board Meetings is insufficient; the Committee failed to prove that TCP exercised 'day-to-day control' over Radnor's business affairs and dictated Radnor's business.").

[83] *In re U.S. Med., Inc.*, 531 F.3d 1272 (10th Cir. 2008) (holding that the creditor, despite having a 10.6% interest in the debtor and having the ability to appoint a member to the debtors' board, was not an insider of the debtor because it had not exercised the required control and undue influence over the debtor); *In re QuVIS, Inc.*, 469 B.R. 353, 368 (D. Kan.), ("But Moulton's status as a statutory insider does not extend to Seacoast because the idea that a corporation can be a 'de facto director' under 11 U.S.C. § 101(31) has no basis in statute or case law.")

[84] *In re Zohar III, Corp.*, 639 B.R. 73, 92 (Bankr. D. Del. 2022) (emphasis in original).

26

the defendant entities is insufficient to establish that the QK Entities controlled the debtors.

More particularly, although Nussdorf is an insider, the board members' participation in the workings of the debtor do not explain how the QK Entities possessed the necessary day-to-day control over the debtor companies such that they were in "actual control" over the debtors.  The complaint alleges that the QK Entities conducted transactions by lending money, obtaining equity in the debtor, and entering transactions under which they redeemed their equity holdings and obtained releases.  But none of these allegations is sufficient to allege the type of day-to-day managerial control sufficient to satisfy the statutory standard.

The Committee points to *In re Papercraft* as a case in which a court determined that a corporation that was entitled to appoint a member of the debtor's board was an insider.[85]    But that case is much different from this one.    There, the board appointee, among other things, used confidential debtor information to advance the interests of his appointing company.  Here, there is no specific factual allegation (beyond the conclusory assertions) that Nussdorf acted outside the scope of his role as a director, much less that he misused his position to benefit the QK Entities.

### 2.    The complaint also fails to allege that Quality King is a non-statutory insider of the debtors.

Section 101(31) sets out what the term insider "includes" rather than what it "means."  The caselaw accordingly makes clear that the statutory enumeration of

---

[85] D.I. 139 at 31-32 (citing 187 B.R. 486, 494-95 (Bankr. W.D. Pa. 1995)).

entities that qualify as "insiders" is not comprehensive. Rather, courts retain the flexibility under the statute to treat a party as an "insider" even if the expressly enumerated statutory criteria are not met. The Committee accordingly argues that even if the defendants do not fall within the Code's express definition of "insider," they nonetheless qualify as non-statutory insiders.

The Committee grounds this argument in the second amended complaint's assertions relating to (1) the proximity of QK Entities to the debtors, (2) the control and influence exerted by the QK Entities on the debtors, and (3) the asserted non-arms'-length transactions between the QK Entities and the debtors.[86] The defendants respond by pointing out that these assertions are largely conclusory, and that the complaint does not contain concrete factual allegations sufficient to establish the kind of close relationship sufficient to meet the requirements of a non-statutory insider.

The Third Circuit's decision in *Winstar* explains that a defendant may be deemed a non-statutory insider upon a showing (i) of the existence of a close relationship between the debtor and the alleged insider, and (ii) that the transactions between the parties were not conducted at arm's-length.[87] Applying that standard here, the second amended complaint fails to allege facts sufficient to make this showing.

---

[86] *See* D.I. 98 ¶¶ 268-283.

[87] 554 F.3d 396-397 (3d Cir. 2009); *see also In re KCMVNO, Inc.*, No. 08-10600/10-50730 (BLS), 2010 WL 4064832, at *4 (Bankr. D. Del. Oct. 15, 2010) (analyzing *In re Winstar* 554 F.3d at 382).

The complaint does assert that the QK Entities and the debtors maintained a longstanding economic relationship. There is no dispute that the debtors viewed Quality King as a critical vendor, that it was one of the debtors' largest unsecured trade creditors, and that the parties had engaged in a number of significant transactions. The second amended complaint further alleges that Nussdorf served on the debtors' board for more than eight years and regularly attended board meetings. But these allegations, even accepted as true, do not appear to allege the type of close relationship necessary, under existing law, to confer non-statutory insider status.[88] Rather, they appear to reflect the dynamics of a significant commercial partnership coupled with a board-level relationship between one individual and the debtor.

In this respect, the circumstances of this case seems to be similar to those in *KCMVNO.* There, the court determined that a non-statutory insider determination was not appropriate under the standard set forth in *Winstar.* The court pointed out that in *Winstar* the facts established that Lucent used the debtor as a mere instrumentality to manipulate its own revenue and exerted near-total control over the debtor's purchasing decisions.[89] In contrast, the facts in *KCMVNO* established that the long-standing supplier/purchaser relationship, despite evidence of NDAs, critical vendor relationships, and use of the debtor's logos for certain operations, was

---

[88] *See id.* (holding that the relationship between the supplier and the purchaser, despite several layers of their relationship, was not probative of a "close relationship" for the purpose of an insider analysis).

[89] *In re KCMVNO, Inc.,* 554 F.3d at 397-400.

not sufficient to establish an insider relationship under the Bankruptcy Code. Based on the allegations here, this case appears to be more like *KCMVNO* than like *Winstar*.

But even if the complaint did satisfy the first prong of the *Winstar* standard, it plainly fails the second, as nothing in the complaint alleges the type of non-arm's length dealings required by *Winstar*. Although plaintiffs repeatedly assert (in conclusory fashion) that the transactions between Quality King and the debtors were not arm's length, the complaint does not allege actual facts that would support that conclusion. Rather, the factual allegations point the other way: the debtors and Quality King negotiated in their respective commercial roles as supplier and purchaser. Nothing in the complaint suggests that the debtors were unable to bargain freely or that Quality King did anything more than exercise whatever commercial leverage it may have had in those negotiations. Unlike in *Winstar*, there is no suggestion that the debtors here were ever simply doing Quality King's bidding. The allegations suggest that the debtors and its management team were doing their best to serve the interests of the debtors. That is the kind of allegation that would be needed (and was present in *Winstar*) to cross the line between the exercise of commercial leverage and the kind of "control" sufficient for one party to be a non-statutory insider of another.

The allegations accordingly fall short of what is necessary to be a non-statutory insider under *Winstar*. They are likely insufficient to allege the kind of close relationship that would meet the first prong of *Winstar*. But even if that prong were

satisfied, they fail to allege the kind of non-arm's length dealings sufficient to meet the second prong.

Accordingly, the preference actions seeking avoidance of transfers outside of the 90-day period, which are premised on Quality King being an insider of the debtors, fail as a matter of law and must be dismissed.

That said, the second amended complaint does allege that certain transfers were made to the QK Entities within the 90-day period.  The allegations with respect to these transactions appear sufficient to establish the elements of a preference under § 547 of the Bankruptcy Code.[90]  Accordingly, the motion to dismiss is denied as to any transfers alleged to have been made within 90-days of the petition date. [91]

### D.    The claim for equitable subordination fails.

Section 510(c) authorizes the Court to "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest."[92]  Equitable subordination is a remedy that allows a court to subordinate the level of priority of a creditor's claim in light of any inequitable conduct committed by that creditor that may have harmed the bankruptcy estate.[93]

---

[90] D.I. 98-1, at 19 of 56.

[91] *Barnhill v. Johnson*, 503 U.S. 393 (1992) (establishing that the date to consider when assessing a preference action under 11 U.S.C. § 547 is not the invoice or delivery date of a check but the date the check is honored).

[92] 11 U.S.C. § 510(c)(1); *In re Opus E., LLC*, 528 B.R. at 105; *In re Winstar*, 554 F.3d at 411 (quoting *Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims*, 323 F.3d 228, 233-34 (3d Cir. 2003)).

[93] 11 U.S.C. § 510(c); *see generally In re Mobile Steel*, 563 F.2d 692 (5th Cir. 1977); *In re Elrod Holdings Corp.*, 421 B.R. 700, 716 (Bankr. D. Del. 2010).

Three conditions must be satisfied before a court will equitably subordinate a claim: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankruptcy estate or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.[94] Equitable subordination is a "drastic" and "unusual" remedy that should only be applied in limited circumstances.[95]

The caselaw provides that if "the misbehaving creditor is a non-insider, the plaintiff must generally allege gross misconduct," whereas if the creditor is an insider, while gross misconduct need not be found, "there still needs to be some plausible allegation of unfair conduct."[96]  For non-insiders, gross misconduct or egregious conduct is generally that which rises to the level of fraud, overreaching, or spoilation, or involves moral turpitude.[97]  The second amended complaint does not allege conduct that would provide a basis to subordinate the defendants' claim under the equitable subordination doctrine.  The plaintiff's claim for equitable subordination will accordingly be dismissed.

---

[94] *In re Winstar*, 554 F.3d at 411-412.

[95] *In re Zohar III, Corp.,* 620 F. Supp. 3d 147, 152 (D. Del. 2022).

[96] *Id.*

[97] *See United States v. State Street Bank and Trust Co.*, 520 B.R. 29, 87 (Bankr. D. Del. 2014) (citations omitted); *In re Mid-American Waste Sys., Inc.*, 284 B.R. 53, 70 (Bankr. D. Del. 2002).

###### E.    The recharacterization claim fails.

The Committee also asks this Court to recharacterize Quality King's term loan as equity rather than a secured claim.  The Committee contends that the term loan was not a *bona fide* loan transaction but rather a disguised equity infusion, pointing to what it says were non-arm's-length terms, the absence of certain traditional repayment features, and the debtors' undercapitalization at the time of funding.  The Committee further argues that recharacterization is appropriate because the economic reality of the transaction was that the term lenders were functioning as investors whose repayment was dependent on the possibility that the debtors would be able to return value to their shareholders, rather than as creditors expecting repayment on standard commercial loan terms.

The recharacterization power is commonly misunderstood.  In this Court's view, nothing in the federal bankruptcy power gives this Court the authority to convert what is *actually* a loan into an equity infusion.  Rather, the authority to recharacterize is a branch of the doctrine under which bankruptcy law does not permit form to control over substance.[98]  Where the underlying economic reality of the situation is that an investment is better understood as the acquisition of equity rather than a loan, the court has the authority to treat it in accordance with that reality.  The point is that "recharacterization" changes the name of the thing to call it what it really is.  There is no power to change what is truly a loan into an equity

---

[98] *See generally, Pepper v. Litton,* 308 U.S. 295, 305 (1939) (bankruptcy law should ensure that "substance will not give way to form").

investment.  Accordingly, recharacterization requires proof that, at the time of the subject transaction, the economic reality of the situation was that the investor was contributing equity capital rather than making a loan.[99]

Courts will infer intent "from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances."[100]  While there is a sense in which this analysis involves a fact-dependent judgment, courts do not hesitate to dismiss recharacterization claims on a motion to dismiss when the factual allegations of the complaint do not provide a basis for recharacterization.[101]

Here, the complaint does little more than recite the elements of a recharacterization claim.  The complaint states in general terms that the term loan was "understood to be a capital infusion."  The complaint alleges that the debtors were in financial distress, that allegedly conflicted directors were involved in approving the transaction, and that the debtors were otherwise unable to obtain financing from a commercial lender.[102]  The complaint does not, however, include

---

[99] *See In re SubMicron Sys. Corp.*, 432 F.3d 448, 458 (3d Cir. 2006).

[100] *Id.* at 456.

[101] *See*, *e.g.*, *In re Our Alchemy, LLC*, No. 16-11596/18-50633 (KG), 2019 WL 4447535, at *6-11 (Bankr. D. Del. Sept. 16, 2019); *In re Licking River Mining, LLC*, 572 B.R. 812, 825 (Bankr. E.D. Ky. 2017); *In re Lyondell Chem. Co.*, 544 B.R. 75, 102-104 (Bankr. S.D.N.Y. 2016); *In re Personal Commc'n Devices, LLC*, 528 B.R. 229, 237-239 (Bankr. E.D.N.Y. 2015); *In re Moll Indus., Inc.*, 454 B.R. 574, 581-585 (Bankr. D. Del. 2011); *In re BH S & B Holdings LLC*, 420 B.R. 112, 160 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 74-75 (Bankr. S.D.N.Y. 2007).

[102] D.I. 98 ¶ 250 ("The facts and circumstances alleged above demonstrate that the Term Loan Agent and Remaining Lenders advanced the funds to the Debtors not as lenders but as investors, with the parties understanding and intending that the Term Lenders would be

factual allegations that the parties themselves intended, at the time the term loan was consummated, to treat the funds as equity rather than debt.  Nor does the complaint allege facts sufficient to show that, under the economic realities of the situation, this transaction was in fact an equity infusion rather than a loan.

The complaint asserts that the term loan was approved by a conflicted board that was controlled directly or indirectly by the term lenders, and that the term loan was understood to be a capital infusion rather than a loan because the lenders "knew there was no known source of repayment of the Term Loan at the time the Tranche A funding was made and that the Debtors were significantly undercapitalized at the time."[103]  The complaint alleges that the defendants' refusal to contribute additional funds after the initial tranche of funding indicates that the single tranche of funding was in fact a capital infusion rather than a loan.

The Committee's argument that the defendants' knowledge of the debtors' undercapitalization evidences an intent to make an equity contribution rather than a loan is unpersuasive.  As *SubMicron* makes clear, when existing lenders advance funds to a distressed borrower, it is often the case that they are seeking to protect their prior credit exposure.  In such circumstances, traditional lending metrics such

---

repaid when the business stabilized and improved, allowing the Debtors to consummate the IPO."); D.I. 98 ⁋ 253 ("The Remaining Term Lenders knew there was no known source of repayment of the Term Loan at the time the Tranche A funding was made and that the Debtors were significantly undercapitalized at the time. Repayment was contingent upon identifying a new investor or a new SPAC or similar IPO transaction. As a result, the Term Loan was structured so as to only commit to funding of the Tranche A Term Loan notwithstanding the Remaining Term Lenders' knowledge that the Debtors required more than the Tranche A Term Loan to fund the Debtors in the short term.")

[103] D.I. 98 ⁋ 253.

as solvency, capitalization, or cash-flow ratios are not evaluated in the same was as they would be for a healthy borrower.[104]  The fact that outside lenders were unwilling to extend additional financing does not by itself transform the term loan into an equity contribution.  Nor does the fact that the defendants declined to advance additional funds beyond the initial tranche support an inference that the lenders in fact made an equity investment.

In sum, the complaint's allegations fall short of plausibly supporting recharacterization.  The Court therefore concludes that the Committee has failed to state a claim upon which relief can be granted, and the motion to dismiss the recharacterization claim will be granted.

### F.    The claim for disallowance under § 502(d) is not dismissed in light of the remaining preference action.

The complaint alleges that certain of the defendants have filed proofs of claim, including for the debt that was due under the term loan.  Section 502(d) of the Bankruptcy Code provides that those claims shall be disallowed unless and until any avoidable transfer that the defendants received is in fact returned to the bankruptcy estate.  Because certain of the preference claims (those made within 90 days of the bankruptcy filing) survive the motion to dismiss, the § 502(d) disallowance claims against those defendants are accordingly sufficient to state a claim.  The motion to dismiss those claims will therefore be denied.

---

[104] *In re SubMicron*, 432 F.3d at 457.

## Conclusion

For the reasons stated above, the motion to dismiss is granted in part and denied in part. The parties are directed to settle an appropriate order.


Dated: September 5, 2025

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE